Elana BACK, Plaintiff–Appellant,

v.

HASTINGS ON HUDSON UNION FREE SCHOOL DISTRICT, John J. Russell, Anne Brennan, Marilyn Wishnie, Defendants–Appellees.

Docket No. 03–7058.

United States Court of Appeals, Second Circuit.

Argued: Aug. 26, 2003.

Decided: April 7, 2004.

Stephen Bergstein, Thornton, Bergstein & Ullrich, LLP, Chester, NY, for Plaintiff–Appellant.

Joan M. Gilbride, Kaufman, Borgeest & Ryan, Valhalla, NY, for Defendants–Appellees.

Before: WINTER, CALABRESI, and KATZMANN, Circuit Judges.

CALABRESI, Circuit Judge.

In 1998, Plaintiff–Appellant Elana Back was hired as a school psychologist at the Hillside Elementary School ("Hillside") on a three-year tenure track. At the end of that period, when Back came up for review, she was denied tenure and her probationary period was terminated. Back subsequently brought this lawsuit, seeking damages and injunctive relief under 42 U.S.C. § 1983 (2000). She alleged that the termination violated her constitutional right to equal protection of the laws. Defendants–Appellees contend that Back was fired because she lacked organizational and interpersonal skills. Back asserts that the real reason she was let go was that the defendants presumed that she, as a young mother, would not continue to demonstrate the necessary devotion to her job, and indeed that she could not maintain such devotion while at the same time being a good mother.

This appeal thus poses an important question, one that strikes at the persistent "fault line between work and family—precisely where sex-based overgeneralization has been and remains strongest." *Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 123 S.Ct. 1972, 1983, 155 L.Ed.2d 953 (2003). It asks whether stereotyping about the qualities of mothers is a form of gender discrimination, and whether this can be determined in the absence of evidence about how the employer in question treated fathers. We answer both questions in the affirmative. We also conclude that the plaintiff has asserted genuine issues of material fact in her gender discrimination claim against two of the individual defendants, Marilyn Wishnie and Ann Brennan. No evidence, however, has been proffered that is sufficient to support liability on the part of the School District or Superintendent Russell. Finally, we hold that qualified immunity does not attach to defendants Brennan and Wishnie, because the right to be free from discriminatory sex stereotyping was well established at the time of the alleged violation.

We therefore affirm the district court's grant of summary judgment to the School District and to Russell, but vacate its grant of summary judgment to Wishnie and Brennan, and, as to them, remand the case for trial.

*A. Background*

The following facts, construed as they must be in the light most favorable to the plaintiff, *see Hotel Employees & Rest. Employees Union, Local 100 v. City of New York Dep't of Parks & Recreation*, 311 F.3d 534, 543 (2d Cir.2002), were adduced in the court below.

### i. Back's Qualifications

As the school psychologist at Hillside Elementary School, Elana Back counseled and conducted psychological evaluations of students, prepared reports for the Committee on Special Education, assisted teachers in dealing with students who acted out in class, worked with parents on issues related to their children, and chaired the "Learning Team," a group made up of specialists and teachers which conducted intensive discussions about individual students. Defendant–Appellee Marilyn Wishnie, the Principal of Hillside, and defendant-appellee Ann Brennan, the Director of Pupil Personnel Services for the District, were Back's supervisors. They were responsible for establishing performance goals for her position, and evaluating Back's work against these standards.

In the plaintiff's first two years at Hillside, Brennan and Wishnie consistently gave her excellent evaluations. In her first annual evaluation, on a scale where the highest score was "outstanding," and the second highest score was "superior," Back was deemed "outstanding" and "superior" in almost all categories, and "average" in only one.[1] "Superior" was, according to the performance instrument, the "standard for consideration for obtaining tenure in Hastings." Narrative evaluations completed by Wishnie and Brennan during this time were also uniformly positive, attesting, for example, that Back had "served as a positive child advocate throughout the year," and had "successfully adjusted to become a valued and valuable member of the school/community."

In her second year at Hillside, Back took approximately three months of maternity leave. After she returned, she garnered another "outstanding" evaluation from Brennan, who noted that she was "very pleased with Mrs. Back's performance during her second year at Hillside." Other contemporaneous observations also resulted in strongly positive feedback, for example, that Back "demonstrate[d] her strong social/emotional skills in her work with parents and teachers, and most especially with students," and that she was "a positive influence in many areas, and continues to extend a great deal of effort and commitment to our work." In her annual evaluation, Back received higher marks than the previous year, with more "outstandings" and no "averages." The narrative comments noted that she "continues to serve in an outstanding manner and provides excellent support for our students," and that her "commitment to her work and to her own learning is outstanding." At the beginning of Back's third year at Hillside, she again received "outstanding" and "superior" evaluations from both Brennan and Wishnie.

Defendant–Appellant John Russell, the Superintendent of the School District, also conducted ongoing evaluations of Back's performance. In January 1999, he observed a Learning Team meeting, and reported that Back had managed the meeting "in a highly efficient and professional manner," and that it was "obvious [that she] was well prepared." He rated her performance "superior." In February 2000, he again sat in on a Learning Team meeting, and again indicated that Back's performance was "superior." He also noted that she was effective without being overly directive, and worked well with the other members of the team. In addition, according to Back, all three individual defendants repeatedly assured her through-

---

**1.** Some characteristics in the evaluation were measured along a two point scale ("satisfactory" or "unsatisfactory") rather than a five point scale. In both 1998–99 and 1999–2000, Back received "satisfactory" marks in each of these categories.

out this time that she would receive tenure.

### ii. Alleged Stereotyping

Back asserts that things changed dramatically as her tenure review approached. The first allegedly discriminatory comments came in spring 2000, when Back's written evaluations still indicated that she was a very strong candidate for tenure. At that time, shortly after Back had returned from maternity leave, the plaintiff claims that Brennan, (a) inquired about how she was "planning on spacing [her] offspring," (b) said " '[p]lease do not get pregnant until I retire,' " and (c) suggested that Back "wait until [her son] was in kindergarten to have another child."

Then, a few months into Back's third year at Hillside, on December 14, 2000, Brennan allegedly told Back that she was expected to work until 4:30 p.m. every day, and asked " 'What's the big deal. You have a nanny. This is what you [have] to do to get tenure.' " Back replied that she did work these hours. And Brennan, after reportedly reassuring Back that there was no concern about her job performance, told her that Wishnie expected her to work such hours. But, always according to Back, Brennan also indicated that Back should "maybe ... reconsider whether [Back] could be a mother and do this job which [Brennan] characterized as administrative in nature," and that Brennan and Wishnie were "concerned that, if [Back] received tenure, [she] would work only until 3:15 p.m. and did not know how [she] could possibly do this job with children."

A few days later, on January 8, 2001, Brennan allegedly told Back for the first time that she might not support Back's tenure because of what Back characterizes as minor errors that she made in a report. According to Back, shortly thereafter Principal Wishnie accused her of working only from 8:15 a.m. to 3:15 p.m. and never working during lunch. When Back disputed this, Wishnie supposedly replied that "this was not [Wishnie's] impression and ... that she did not know how she could perform my job with little ones. She told me that she worked from 7 a.m. to 7 p.m. and that she expected the same from me. If my family was my priority, she stated, maybe this was not the job for me." A week later, both Brennan and Wishnie reportedly told Back that this was perhaps not the job or the school district for her if she had "little ones," and that it was "not possible for [her] to be a good mother and have this job." The two also allegedly remarked that it would be harder to fire Back if she had tenure, and wondered "whether my apparent commitment to my job was an act. They stated that once I obtained tenure, I would not show the same level of commitment I had shown because I had little ones at home. They expressed concerns about my child care arrangements, though these had never caused me conflict with school assignments." They did not—as Back told the story—discuss with her any concerns with her performance at that time.

Back claims that in March, Brennan and Wishnie reiterated that her job was "not for a mother," that they were worried her performance was "just an 'act' until I got tenure," and that "because I was a young mother, I would not continue my commitment to the work place." On April 30, 2001, Brennan and Wishnie purportedly repeated the same concerns about her ability to balance work and family, and told Back that they would recommend that she not be granted tenure and that Superintendent Russell would follow their recommendation. They reportedly also "stated they wanted another year to assess the child care situation."

Brennan and Wishnie both testified in depositions that they never questioned Back's ability to combine work and motherhood, and did not insinuate that they thought the commitment that Back had previously demonstrated was an "act." They contended, instead, that Back was told at these meetings that both had concerns about her performance, and that she would need to make progress in certain areas in order to receive tenure.

### iii. Denial of Tenure

Back retained counsel in response to Brennan and Wishnie's alleged statements, and in a letter dated May 14, 2001, informed Russell of these comments, and of her fear that they reflected attitudes that would improperly affect her tenure review.[2] On May 29, 2001, Brennan and Wishnie sent a formal memo to Russell informing him that they could not recommend Back for tenure. Their reasons included (a) that although their formal reports had been positive, their informal interactions with her had been less positive, (b) that there were "far too many" parents and teachers who had "serious issues" with the plaintiff and did not wish to work with her, and (c) that she had persistent difficulties with the planning and organization of her work, and with inaccuracies in her reports, and that she had not shown improvement in this area, despite warnings.

In a letter dated June 5, 2001, Back's counsel informed Russell that Back believed that Brennan and Wishnie were retaliating against her, citing, *inter alia*, that Brennan was "openly hostile" towards Back, that she falsely accused Back of mishandling cases and giving false information, that she increased Back's work-

load, and that positive letters were removed from Back's file.

On or around June 13, 2001, Wishnie and Brennan filed the first negative evaluation of Back, which gave her several "below average" marks and charged her with being inconsistent, defensive, difficult to supervise, the source of parental complaints, and inaccurate in her reports. Their evaluation, which was submitted to Russell, concluded that Back should not be granted tenure. Around the same time, several parents who had apparently complained about Back were encouraged by Russell to put their concerns in writing. Several parents submitted letters, reporting a range of complaints about Back's work, including that she was defensive, immature, unprofessional, and had misdiagnosed children.

On June 18, 2001, Russell informed Back by letter that he had received Wishnie and Brennan's annual evaluation, and was recommending to the Board of Education that her probationary appointment be terminated. The union filed a grievance on Back's behalf, claiming that Brennan and Wishnie's discriminatory comments tainted the termination decision. The grievance review process first involved an evaluation by Wishnie, who denied making any comments about the incompatibility of Back's work and motherhood, and concluded that the union grievance was without merit. At the second stage of the process, a panel, consisting of two teachers in the district and an administrator, was convened by the Board of Education. The group examined the plaintiff's file, interviewed Back, Brennan, and Wishnie, and reported to Russell in July that it agreed with his recommendation not to grant plaintiff tenure. In September 2001, the Board notified Back

---

**2.** Thereafter, Russell apparently interviewed Brennan and Wishnie, who denied discriminating against Back. In June, Russell told Back that he found her complaint meritless.

that her probationary appointment would be terminated.[3]

### iv. Proceedings in the District Court

In October 2001, Back brought this claim in the United States District Court for the Southern District of New York under 42 U.S.C. § 1983, alleging gender discrimination in violation of the Equal Protection Clause.[4] She also claimed violations of New York State's Executive Law. The district court granted summary judgment for the defendants, on the grounds (a) that this Circuit had not held that a "sex plus" claim can be brought under § 1983, (b) that defendants' comments were "stray remarks" which did not show sex discrimination, (c) that Back had failed to prove that the reasons given for not granting her tenure were pretextual, (d) that there was no genuine issue of material fact supporting § 1983 liability against Russell and the School District, and (e) that qualified immunity justified summary judgment in favor of the three individual defendants, on the grounds that Brennan and Wishnie had objective cause to deny Back tenure, and that Russell had relied upon their evaluations and had conducted an impartial review. Judge Brieant also dismissed the state law claims without prejudice to their being pursued in state court.[5] This appeal followed.

3. Back had originally been scheduled for tenure review in June 2001, but because she had taken maternity leave, her tenure date was deferred until January 2002. In order to make the process coincide with the normal flow of hiring, however, Back and Russell agreed that she would be considered for tenure in June 2001, and that, if she was denied, her probationary period would be terminated at that point. Thus, although the parties sometimes treat the denial of tenure as the adverse employment action, the gravamen of Back's complaint is, in fact, the termination of her probationary period. Nonetheless, as the two decisions were intertwined, we follow the parties in discussing them together.

## DISCUSSION

Plaintiff presses three arguments on appeal. First, she contends that an adverse employment consequence imposed because of stereotypes about motherhood is a form of gender discrimination which contravenes the Equal Protection Clause. Second, she argues that the district court wrongly resolved disputed issues of material fact, and that summary judgment was inappropriate both as to the discrimination claim and as to the liability of the School District and Russell. Finally, the plaintiff insists that the district court erred in finding that Brennan, Wishnie, and Russell were entitled to qualified immunity. We consider each argument in turn.

### A. Theory of Discrimination

 Individuals have a clear right, protected by the Fourteenth Amendment, to be free from discrimination on the basis of sex in public employment. *See Davis v. Passman*, 442 U.S. 228, 234–35, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979); *Rodriguez v. Bd. of Educ.*, 620 F.2d 362, 366 (2d Cir. 1980). "[A]n employment discrimination plaintiff alleging the violation of a constitutional right may bring suit under § 1983 alone, and is not required to plead concurrently a violation of Title VII [of the Civil

4. Brennan, Wishnie, and Superintendent Russell each were sued solely in their individual capacities.

5. Because we reinstate the federal claims, the plaintiff's state law claims also return. We express no opinion on whether these state law claims against each of the defendants originally sued has validity under state law. We simply vacate the district court's dismissal of these claims against the named defendants and remand the issues to that court for its consideration.

Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*]." *Annis v. County of Westchester*, 36 F.3d 251, 255 (2d Cir.1994); *see also Saulpaugh v. Monroe Cmty. Hosp.*, 4 F.3d 134, 143 (2d Cir.1993). Back does not allege a violation of Title VII, nor does she allege that the defendants violated her constitutional rights to have and care for children.[6] We therefore consider only whether she has alleged facts that can support a finding of gender discrimination under the Equal Protection Clause.

 To make out such a claim, the plaintiff must prove that she suffered purposeful or intentional discrimination on the basis of gender. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264–65, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). Discrimination based on gender, once proven, can only be tolerated if the state provides an "exceedingly persuasive justification" for the rule or practice. *United States v. Virginia*, 518 U.S. 515, 524, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996)

(internal quotation marks omitted). The defendants in this case have made no claim of justification; thus our inquiry revolves solely around the allegation of discrimination.

 In deciding whether Back has alleged facts that could support a finding of discrimination, we must first address the district court's suggestion, and the defendants' argument, that Back's claim is a "gender-plus" claim,[7] and as such, not actionable under § 1983. This contention is without merit. The term "sex plus" or "gender plus" is simply a heuristic. It is, in other words, a judicial convenience developed in the context of Title VII to affirm that plaintiffs can, under certain circumstances, survive summary judgment even when not all members of a disfavored class are discriminated against.[8] Although we have never explicitly said as much, "sex plus" discrimination is certainly actionable in a § 1983 case. The Equal Protection Clause forbids sex discrimination no mat-

6. Because individuals have a due process right to be free from undue interference with their procreation, sexuality, and family, *see, e.g., Lawrence v. Texas*, 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003); *Eisenstadt v. Baird*, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), some have suggested that a strict level of scrutiny must be applied to any state action that discriminates on the basis of childbearing or family care. *See e.g.*, Joan C. Williams & Nancy Segal, *Beyond the Maternal Wall: Relief for Family Caregivers Who Are Discriminated Against on the Job*, 26 Harv. Women's L.J. 77, 152 & n. 506 (2003). But no such claim is made in this case, and, hence, we express no opinion with respect to it.

7. The term "gender plus" (or "sex plus," as it is more commonly known) "refers to a policy or practice by which an employer classifies employees on the basis of sex *plus* another characteristic." 1 Barbara Lindemann &

Paul Grossman, *Employment Discrimination Law* 456 (3d ed.1996). "In such cases the employer does not discriminate against the class of men or women as a whole but rather treats differently a subclass of men or women." *Id.*

8. *See, e.g., McGrenaghan v. St. Denis Sch.*, 979 F.Supp. 323, 327 (E.D.Pa.1997) ("The rationale behind the 'sex-plus' theory of gender discrimination is to enable Title VII plaintiffs to survive summary judgment where the employer does not discriminate against all members of a sex."). The term itself, when applied to particular cases, is often more than a little muddy. For example, both parties in this case seem to agree that *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (plurality opinion), is a "sex" rather than a "sex plus" case. In a parenthetical, however, this Circuit has stated the opposite. *See Fisher v. Vassar College*, 70 F.3d 1420, 1433 (2d Cir.1995) (characterizing *Price Waterhouse* as a case involving "sex plus gender stereotypes"); *adhered to* 114 F.3d 1332 (2d Cir.1997) (in banc).

ter how it is labeled.[9] The relevant issue is not whether a claim is characterized as "sex plus" or "gender plus," but rather, whether the plaintiff provides evidence of purposefully sex-discriminatory acts.

■ To show sex discrimination, Back relies upon a *Price Waterhouse* "stereotyping" theory. Accordingly, she argues that comments made about a woman's inability to combine work and motherhood are direct evidence of such discrimination. In *Price Waterhouse*, Ann Hopkins alleged that she was denied a partnership position because the accounting firm where she worked had given credence and effect to stereotyped images of women. *Price Waterhouse*, 490 U.S. at 235–36, 109 S.Ct. 1775. Hopkins had been called, among other things, " 'macho' " and " 'masculine,' " was told she needed " 'a course at charm school,' " and was instructed to " 'walk more femininely, talk more femininely, dress more femininely, wear makeup, have her hair styled, and wear jewelry' " if she wanted to make partner. *Id.* at 235, 109 S.Ct. 1775. Six members of the Court agreed that such comments bespoke gender discrimination. *See id.* at 251, 109 S.Ct. 1775 ("[W]e are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group . . . ."); *id.* at 258, 109 S.Ct. 1775 (White, J., concurring); *id.* at 272–73, 109 S.Ct.

1775 (O'Connor, J., concurring) (characterizing the "failure to conform to [gender] stereotypes" as a discriminatory criterion).

■ It is the law, then, that "stereotyped remarks can certainly be evidence that gender played a part" in an adverse employment decision. *Id.* at 251, 109 S.Ct. 1775 (italics omitted). The principle of *Price Waterhouse*, furthermore, applies as much to the supposition that a woman *will* conform to a gender stereotype (and therefore will not, for example, be dedicated to her job), as to the supposition that a woman is unqualified for a position because she does *not* conform to a gender stereotype. *Cf. Weinstock v. Columbia Univ.*, 224 F.3d 33, 44–45 (2d Cir.2000) (suggesting that *Price Waterhouse* applies where a woman is maltreated for being too feminine, but finding inadequate evidence that plaintiff herself was thus stereotyped), *cert. denied*, —— U.S. ——, 124 S.Ct. 53, 157 L.Ed.2d 24 (2003); *see also id.* at 57 (Cardamone, J., dissenting) (concluding that *Price Waterhouse* applies whether the plaintiff is stereotyped as too feminine or too masculine, because in both cases, women "face[ ] . . . employers [who] demand[ ] that they perform both 'masculine' and 'feminine' roles, yet perceive[ ] those roles as fundamentally incompatible").

■ The instant case, however, foregrounds a crucial question: What consti-

---

**9.** Discrimination that might be called "sex plus" in the Title VII context has, of course, been found to violate the Equal Protection Clause. *See, e.g., Weinberger v. Wiesenfeld*, 420 U.S. 636, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975) (holding that a statute that treats widowers less favorably than widows—which, in the Title VII context, might have been called a "sex plus marital status" claim—violates the Equal Protection Clause). Indeed, any meaningful regime of antidiscrimination law must encompass such claims. For, as the judge that coined the term "sex plus" pointed out:

> Free to add non-sex factors, the rankest sort of discrimination against women can be worked by employers. This could include, for example, all sorts of physical characteristics, such as minimum weight (175 lbs.), minimum shoulder width, minimum biceps measurement, minimum lifting capacity (100 lbs.), and the like. Others could include minimum educational requirements (minimum high school, junior college), intelligence tests, aptitude tests, etc.

> *Phillips v. Martin Marietta Corp.*, 416 F.2d 1257, 1260· (5th Cir.1969) (Brown, C.J., dissenting from denial of rehearing en banc).

tutes a "gender-based stereotype"? *Price Waterhouse* suggested that this question must be answered in the particular context in which it arises, and without undue formalization. We have adopted the same approach, as have other circuits.[10] Just as "[i]t takes no special training to discern sex stereotyping in a description of an aggressive female employee as requiring 'a course at charm school,'" *Price Waterhouse*, 490 U.S. at 256, 109 S.Ct. 1775, so it takes no special training to discern stereotyping in the view that a woman cannot "be a good mother" and have a job that requires long hours, or in the statement that a mother who received tenure "would not show the same level of commitment [she] had shown because [she] had little

ones at home." These are not the kind of "innocuous words" that we have previously held to be insufficient, as a matter of law, to provide evidence of discriminatory intent. *See Weinstock*, 224 F.3d at 45.

Not surprisingly, other circuit courts have agreed that similar comments constitute evidence that a jury could use to find the presence of discrimination. *See, e.g., Santiago–Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 57 (1st Cir.2000) (evidence that a direct supervisor had "specifically questioned whether [the plaintiff] would be able to manage her work and family responsibilities" supported a finding of discriminatory animus, where plaintiff's employment was terminated shortly thereafter); *Sheehan v. Donlen Corp.*, 173 F.3d

**10.** Thus, we have indicated that the use of the words "nice" and "nurturing" to describe a female professor would not, in and of itself, provide evidence of discriminatory pretext or intent. *See Weinstock*, 224 F.3d at 45; *see also Zalewska v. County of Sullivan*, 316 F.3d 314, 323 (2d Cir.2003) (declining to give credence to the "stereotype[]" that a woman wearing pants is dressed "more masculinely"); *Fisher*, 114 F.3d at 1360 & n. 12 (Calabresi, J., concurring in part and dissenting in part) (referring to the "stereotypical view that married women with children spend less time in the lab"). Similarly, we have taken notice of the "demeaning ethnic stereotype that Jews are 'cheap.'" *Mandell v. County of Suffolk*, 316 F.3d 368, 378 (2d Cir.2003).

Other circuits have taken a similarly informal approach to the question of when a stereotype can legitimately be presumed to be "because of sex." For example, the Seventh Circuit held, in a sexual harassment case, that:

> [A] man who is harassed because his voice is soft, his physique is slight, his hair is long, or because in some other respect he exhibits his masculinity in a way that does not meet his coworkers' idea of how men are to appear and behave, is harassed "because of" *his* sex.... Just as in *Price Waterhouse*, then, gender stereotyping establishes the link to the plaintiff's sex that Title VII requires.... The question in both cases is whether a particular action (in *Price Water-*

*house*, the exclusion from partnership, here, the harassment by co-workers) can be attributed to sex; reliance upon stereotypical notions about how men and women should appear and behave (in *Price Waterhouse*, by the partners, here, by H. Doe's tormentors) reasonably suggests that the answer to that question is yes. One need only consider for a moment whether H.'s gender would have been questioned for wearing an earring if he were a woman rather than a man. It seems an obvious inference to us that it would not. (Of course, this is ultimately for the factfinder to resolve; we are merely considering what inferences one may reasonably draw from the evidence before us.)

*Doe ex rel. Doe v. City of Belleville*, 119 F.3d 563, 581–82 (7th Cir.1997) (emphasis added, citations omitted), *vacated by* 523 U.S. 1001, 118 S.Ct. 1183, 140 L.Ed.2d 313 (1998) (remanding the case in light of *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)); *see also Nichols v. Azteca Rest. Enters.*, 256 F.3d 864, 874 (9th Cir.2001) ("At its essence, the systematic abuse directed at Sanchez reflected a belief that Sanchez did not act as a man should act. Sanchez was attacked for walking and carrying his tray 'like a woman,' .... derided for not having sexual intercourse with a waitress[,] .... [a]nd, the most vulgar name-calling directed at Sanchez was cast in female terms. We conclude that this verbal abuse was closely linked to gender.").

1039, 1044–45 (7th Cir.1999) (holding, in a Pregnancy Discrimination Act case, that a reasonable jury could have concluded that "a supervisor's statement to a woman known to be pregnant that she was being fired so that she could 'spend more time at home with her children' reflected unlawful motivations because it invoked widely understood stereotypes the meaning of which is hard to mistake"); *id.* at 1044 (remarks by the head of plaintiff's department that "she would be happier at home with her children" provided direct evidence of discriminatory animus).

Moreover, the Supreme Court itself recently took judicial notice of such stereotypes. In an opinion by Chief Justice Rehnquist, the Court concluded that stereotypes of this sort were strong and pervasive enough to justify prophylactic congressional action, in the form of the Family Medical Leave Act:

> Stereotypes about women's domestic roles are reinforced by parallel stereotypes presuming a lack of domestic responsibilities for men. Because employers continued to regard the family as the woman's domain, they often denied men similar accommodations or discouraged them from taking leave. These mutually reinforcing stereotypes created a self-fulfilling cycle of discrimination that forced women to continue to assume the role of primary family caregiver, and fostered employers' stereotypical views about women's commitment to work and their value as employees. Those perceptions, in turn, Congress reasoned, lead to subtle discrimination that may be difficult to detect on a case-by-case basis.

*Nev. Dep't of Human Res. v. Hibbs,* 538 U.S. 721, 123 S.Ct. 1972, 1982, 155 L.Ed.2d 953 (2003).

The defendants argue that stereotypes about pregnant women or mothers are not based upon gender, but rather, "gender plus parenthood," thereby implying that such stereotypes cannot, without comparative evidence of what was said about fathers, be presumed to be "on the basis of sex." *Hibbs* makes pellucidly clear, however, that, at least where stereotypes are considered, the notions that mothers are insufficiently devoted to work, and that work and motherhood are incompatible, are properly considered to be, themselves, gender-based. *Hibbs* explicitly called the stereotype that "women's family duties trump those of the workplace" a *"gender stereotype," id.* at 1979 n. 5 (emphasis added), and cited a number of state pregnancy and family leave acts—including laws that provided *only* pregnancy leave—as evidence of "pervasive sex-role stereotype that caring for family members is women's work," *id.* at 1979–80 & nn. 5–6.

Defendants are thus wrong in their contention that Back cannot make out a claim that survives summary judgment unless she demonstrates that the defendants treated similarly situated men differently. Back has admittedly proffered no evidence about the treatment of male administrators with young children. Although her case would be stronger had she provided or alleged the existence of such evidence, there is no requirement that such evidence be adduced. Indeed we have held that,

> In determining whether an employee has been discriminated against "because of *such individual's* . . . sex," the courts have consistently emphasized that the ultimate issue is the reasons for *the individual plaintiff's* treatment, not the relative treatment of different *groups* within the workplace. As a result, discrimination against one employee cannot be cured, or disproven, solely by favorable, or equitable, treatment of other employees of the same race or sex.

*Brown v. Henderson,* 257 F.3d 246, 252 (2d Cir.2001) (citations omitted).

 Defendants also fail in their claim that they are immune from Back's allegations simply because, in the year that Back was hired, 85% of the teachers employed at Hillside were women, and 71% of these women had children. As *Brown* indicates, although the jury is surely allowed to consider such comparative evidence, what matters is how *Back* was treated. Furthermore, the defendants make no mention of the number of men or women in *administrative* positions, nor of the age of any of the relevant children. Both details are essential if the comparative evidence adduced by the defendants is to be given any weight.[11] Because we hold that stereotypical remarks about the incompatibility of motherhood and employment "can certainly be *evidence* that gender played a part" in an employment decision, *Price Waterhouse,* 490 U.S. at 251, 109 S.Ct. 1775, we find that *Brown* applies to this case. As a result, stereotyping of women as caregivers can by itself and without more be evidence of an impermissible, sex-based motive.

### B. Was Summary Judgment Appropriate?

To say that the stereotyping here alleged can constitute sex-discrimination is not enough, however. We must also determine whether the plaintiff has adduced enough evidence to defeat summary judgment as regards her discrimination claim, and has done so with respect to each of the defendants sued. We review a district court's grant of summary judgment *de novo.* To justify summary judgment, the defendants must show that "there is no genuine issue as to any material fact" and

that they are "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). We resolve all ambiguities, and credit all rational factual inferences, in favor of the plaintiff. *Cifra v. Gen. Elec. Co.,* 252 F.3d 205, 216 (2d Cir.2001).

### i. Section 1983 Claim Against Brennan and Wishnie

 Title 42 U.S.C. § 1983 provides, in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

In order to establish individual liability under § 1983, a plaintiff must show (a) that the defendant is a "person" acting "under the color of state law," and (b) that the defendant caused the plaintiff to be deprived of a federal right. *See, e.g., Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). Additionally, "[i]n this Circuit personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977).

 According to the Supreme Court, "a person acts under color of state law only when exercising power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Polk County v.*

---

**11.** Furthermore, insofar as we hold that Brennan and Wishnie are the only proper defendants in this case, comparative data

about the employment practices of anyone other than these two defendants has little, if any, value for the factfinder.

*Dodson,* 454 U.S. 312, 317–18, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981) (quoting *United States v. Classic,* 313 U.S. 299, 326, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941)); *see also West v. Atkins,* 487 U.S. 42, 49, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). "[S]tate employment is generally sufficient to render the defendant a state actor." (*Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 935 n. 18, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982)). There is little doubt that Brennan and Wishnie were "personally involved" in the purported deprivation, or that they acted under the color of state law when they recommended against Back's tenure and evaluated her negatively. The question remains, then, whether there is sufficient evidence for a jury to find that they acted to deprive Back of her right to be free from discrimination on the basis of gender.

### a. Deprivation of Federal Right

 In assessing Back's claim, we rely upon the familiar *McDonnell Douglas* framework. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Sorlucco v. New York City Police Dep't,* 888 F.2d 4, 7 (2d Cir.1989) (holding that the *McDonnell Douglas* framework applies to § 1983 cases). We therefore inquire first whether the plaintiff has successfully asserted a prima facie case of gender discrimination against these defendants. " '[A] plaintiff may rely on direct evidence of what the defendant did and said' in satisfying her initial burden under *McDonnell Douglas.*" *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 77 (2d Cir.2001) (quoting *Tarshis v. Riese Org.,* 211 F.3d 30, 35 (2d Cir.2000)). Once a plaintiff makes out a prima facie case of discrimination, the defendants have the burden of showing a legitimate, nondiscriminatory reason for their actions. In order to prevent summary judgment in favor of the plaintiff at this stage, that explanation must, if taken as true, *"permit*

the conclusion that there was a nondiscriminatory reason for the adverse action." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 509, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

 The plaintiff then has the opportunity to prove "by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Of course, "[t]o defeat summary judgment within the *McDonnell Douglas* framework … the plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating' factors." *See Holtz,* 258 F.3d at 78 (internal quotation marks omitted). Regardless of whether the plaintiff can prove pretext, she or he bears the ultimate burden of persuasion, and must adduce enough evidence of discrimination so that a rational fact finder can conclude that the adverse job action was more probably than not caused by discrimination. *See St. Mary's Honor Ctr.,* 509 U.S. at 511, 113 S.Ct. 2742 (holding that "rejection of the defendant's proffered reasons [for the adverse action] will *permit* the trier of fact to infer the ultimate fact of intentional discrimination" but does not "*compel* [ ]" this inference); *Fisher,* 114 F.3d at 1336 (stating that, after the defendant proffers a legitimate, non-discriminatory reason for the action, "[t]he question becomes the same question asked in any other civil case: Has the plaintiff shown, by a preponderance of the evidence, that the defendant is liable for the alleged conduct?").

To meet his or her ultimate burden, the plaintiff may, depending on how strong it is, rely upon the same evidence that comprised her prima facie case, without more. *See Holtz,* 258 F.3d at 79 (citing *Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 203 (2d Cir.1995)). And as with the first stage' of *McDonnell Douglas,* Back is not required to provide evidence that similarly situated men were treated differently. *Holtz,* 258 F.3d at 78 ("[J]ust as evidence of disparate treatment is not an essential element of a prima facie case of discrimination, such evidence is also not always necessary at the final stage of the *McDonnell Douglas* analysis." (citation omitted)). And unless the defendants' proffered nondiscriminatory reason is "dispositive and forecloses any issue of material fact," summary judgment is inappropriate. *Carlton v. Mystic Transp., Inc.,* 202 F.3d 129, 135 (2d Cir.2000); *see also Holtz,* 258 F.3d at 79 (noting that the issue of pretext "is ordinarily for the jury to decide at trial rather than for the court to determine on a motion for summary judgment").

Applying this to the facts before us, we hold that Back has clearly produced sufficient evidence to defeat summary judgment as to Brennan and Wishnie. She has made out her prima facie case by offering evidence of discriminatory comments, which can constitute "direct evidence," and are adequate to make out a prima facie case, even where uncorroborated.[12] *Holtz,* 258 F.3d at 77–78. The nondiscriminatory reasons proffered by Brennan and Wishnie for their negative evaluations—namely, Back's poor organizational skills and her negative interactions with parents—are in no way dispositive. Viewing the evidence in the light most favorable to Back, a jury could find that the administrative deficiencies cited by the defendants were minor, and unimportant to the defendants before the development of the purported discriminatory motive.[13] As for the parental complaints, it is unclear which of these Brennan and Wishnie were aware of at the time of their negative recommendations and evaluations. But Back's allegations, in any event, are sufficient to allow a jury to find that these complaints were not the real reason for their proffered criticisms of Back. Back asserts, for example, that "[i]n even the most supportive school setting, whether dealing with a teacher or provider of special services, as I was, a small minority of parents will always be critical of the professional. I had very minor skirmishes with several parents while in Hastings. But ... Brennan and Wishnie always emphasized to me that I was doing an excellent job and that the complaining parent had her own problems coping with the reality of having a classified child." If some of these "skirmishes" were in Back's first two years, as she alleges, then her

---

12. The district court inaccurately characterized Brennan and Wishnie's purported statements about Back's inability to combine work and motherhood as "stray remarks." [JA 13] The comments alleged were (1) made repeatedly, (2) drew a direct link between gender stereotypes and the conclusion that Back should not be tenured, and (3) were made by supervisors who played a substantial role in the decision to terminate. As such, they are sufficient to support a finding of discriminatory motive. *Cf. Rose v. New York City Bd. of Educ.,* 257 F.3d 156, 162 (2d Cir.2001).

13. Back alleges, for example, that she was never criticized for filing late reports, and that Brennan even apologized to her for the fact that Back lacked secretarial support and had to type and copy all of the reports herself. Back's second annual report did indicate that it was important that Back "carry out her work in an organized, timely manner," but noted that she had "made some fine efforts to address this concern." Her overall mark on that report was "outstanding."

performance evaluations—conducted by Brennan and Wishnie—also tend to support her version of events.[14] Similarly, although Back's second year evaluations indicated that she faced some challenges in dealing with teachers and parents who were resistant to her advocacy for students, they also noted that Back was aware these issues and working to "enhance" this area.[15] Back also alleges that Brennan and Wishnie instructed her not to have parents or supporters submit positive letters for her file. This, and the sudden decline in performance evaluations that occurred between the beginning and end of Back's third year—that is, only after the alleged discriminatory comments began—support a conclusion of pretext.[16] *See Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 56 (2d Cir.1998).

We conclude that a jury could find, on the evidence proffered, that Brennan and Wishnie's cited justifications for their adverse recommendation and evaluation were pretextual, and that discrimination was one of the "motivating" reasons for the recommendations against Back's tenure.

### b. Proximate Cause

Of course, to prove employment discrimination, the plaintiff must show more than invidious intent. She must also "demonstrate that the causal connection between the defendant's action and the plaintiff's injury is sufficiently direct." *Gierlinger v. Gleason*, 160 F.3d 858, 872 (2d Cir.1998).[17] "[O]rdinary principles of causation" apply to this inquiry into proximate cause. *Id.* Applying such principles, it is clear that "impermissible bias of a single individual at any stage of the promoting process may taint the ultimate employment decision .... even absent evidence of illegitimate bias on the part of the ultimate decision maker, so long as the individual shown to have the impermissible bias played a meaningful

---

**14.** These reports included comments about her "positive," "accepting," and "sensitive" interaction with parents, and rated her "outstanding" at "work[ing] with parents in areas of mutual concern for the good of the student."

**15.** Back also contends that one parental complaint cited by the defendants—that she had misdiagnosed a child with Tourette's Syndrome—was inaccurate, and that is was also satisfactorily addressed at the time of the initial complaint, which was sometime during her second year.

**16.** Such a decline may be particularly meaningful in the context of a stereotyping claim. Studies have demonstrated that stereotypes are associated with "cognitive biases," which cause people to ignore or exclude information that is inconsistent with a stereotype. *See, e.g.*, Madeline E. Heilman, *Sex Stereotypes and Their Effects in the Workplace: What We Know and What We Don't Know*, 10 J. Soc. Behav. & Personality 3, 4–7 (1995). Even a subtle reversal in evaluations that is consistent with stereotypical views about mothers, therefore (for example, that an employee no longer seems dedicated to her work, or is no longer able to work efficiently or complete her work in a timely fashion) suggests pretext. That *this* particular pretext was chosen, additionally, supports the conclusion that discrimination was the real reason for the adverse action. *See Fisher v. Vassar Coll.*, 114 F.3d 1332, 1360 n. 12 (2d Cir.1997) (Calabresi, J., concurring in part and dissenting in part) (suggesting that "a bare finding that a false answer is plausibly connected to an offensive stereotype makes that false answer considerably more probative of discrimination than a pretextual answer that is unconnected to such a stereotype").

**17.** *Gierlinger* provides a helpful explanation of the distinction between the motivational and causal requirements. The motivating factor test can be "satisfied by proof that the recommendation and conduct of [the alleged discriminator] were substantially motivated by [discrimination]; and the jury could find the necessary causation if it concluded that the [discriminatory action] proximately led to the ultimate decision." *Id.* at 873.

role in the ... process." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 450 (2d Cir. 1999).

In the case before us, the existence of enough evidence of proximate cause to get by summary judgment as regards these two defendants is not in doubt. Brennan and Wishnie were Back's immediate supervisors, and they were responsible for evaluating Back's performance. They issued a direct recommendation against her tenure to Superintendent Russell, and in so doing, made numerous accusations of poor performance, which Back insists were overblown and pretextual.[18] They also issued Back a very negative final annual evaluation. That evaluation was the sole factor that Superintendent Russell cited to Back when he informed her that he would recommend that she be terminated. Russell also averred in an affidavit that he relied in part upon the recommendations of Wishnie and Brennan in deciding not to recommend Back for tenure. The Board of Education was, of course, the ultimate decision maker in the termination, but it appears to have voted without making an independent inquiry into the allegations of discrimination, and directly after hearing the recommendation of Russell, which was admittedly influenced by the views of Brennan and Wishnie.

And although "in cases brought under § 1983 a superseding cause, as traditionally understood in common law tort doctrine, will relieve a defendant of liability," *Warner v. Orange County Dep't of Prob.*, 115 F.3d 1068, 1071 (2d Cir.1997), none of the evidence presented requires the finding, as a matter of law, that an intervening cause sufficient to break the chain of causation existed. The Board's action, and Russell's negative recommendation were certainly " 'normal or foreseeable consequence[s]' " of Brennan's and Wishnie's negative recommendations. *Stagl v. Delta Airlines, Inc.*, 52 F.3d 463, 473 (2d Cir.1995) (quoting *Derdiarian v. Felix Contracting Corp.*, 51 N.Y.2d 308, 315, 434 N.Y.S.2d 166, 414 N.E.2d 666 (1980)).[19] The same applies to the independent review panel, which supported Russell's recommendation against tenure, but did so only after interviewing Brennan and Wishnie. Finally, although a jury might conclude that the Board and Russell would have made the same decision regardless of Brennan's and Wishnie's input—and solely on the basis of the parental criticisms—the evidence also permits a jury to conclude that these complaints would have been insufficient on their own to cause Back's termination. (This is especially so given the strength of Back's record, and the fact that the negative parental letters might not have been written absent the encouragement of Russell, who in turn was influenced by the opinions of Brennan and Wishnie.) In sum, we hold that Back has proffered sufficient evidence of proximate cause to survive summary judgment as to Brennan and Wishnie.[20]

18. If the jury found that these allegations were pretextual, they could also conclude that these defendants proximately caused the termination by fatally tainting the pool of information about Back. Even if the jury concluded that Brennan's and Wishnie's criticisms of Back's performance, though genuine, were not the "motivating" reason for their negative evaluations, it could still determine that Brennan's and Wishnie's actions proximately caused the final decision, if the jury believed that these defendants' negative evaluations *as such* were important to the ultimate decision makers.

19. Indeed, according to Back, Wishnie specifically told Back that Russell would follow Wishnie's negative tenure recommendation.

20. To say that the evidence is sufficient to survive summary judgment does not, of course, mean that liability exists. It remains the duty of a fact finder to decide the ultimate

### ii. Section 1983 Liability Against Superintendent Russell

An individual cannot be held liable for damages under § 1983 "merely because he held a high position of authority," but can be held liable if he was personally involved in the alleged deprivation. *See Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir.1996). Personal involvement can be shown by:

> evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference ... by failing to act on information indicating that unconstitutional acts were occurring.

*See Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir.1995).

Viewing the evidence in the light most favorable to the plaintiff, we affirm the district court's grant of summary judgment in favor of Russell, because no material facts exist that could support a jury finding of his liability under § 1983. There is no allegation that Russell engaged directly in any discriminatory conduct. Nor does the evidence suggest "deliberate indifference" of the sort that shows that "the defendant intended the discrimination to occur." *Gant ex rel.*

*Gant v. Wallingford Bd. of Educ.*, 195 F.3d 134, 141 (2d Cir.1999). "[D]eliberate indifference can be found when the defendant's response to known discrimination 'is clearly unreasonable in light of the known circumstances.'" *Id.* (quoting *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 648, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999)). This standard is not, however, "a mere reasonableness standard that transforms every school disciplinary decision into a jury question." *Id.* (internal quotation marks omitted). "In an appropriate case, there is no reason why courts, on a motion ... for summary judgment ..., could not identify a response as not 'clearly unreasonable' as a matter of law." *Id.* (quoting *Davis*, 526 U.S. at 649, 119 S.Ct. 1661).

And this is such a case. Russell conducted his own inquiry into Back's tenure-worthiness that included two sessions of personal observation. He examined her personnel file, spoke to parents, and drew on the information supplied to him by Back's direct supervisors. Russell also conducted an inquiry into Back's claim of discrimination, interviewing both Brennan and Wishnie about the allegations. There is no indication that either his observations of Back or his investigation were undertaken with a jaundiced eye. None of the evidence, therefore, tends to show that Russell meant to discriminate when he recommended against Back's tenure. Even if the jury were to find that Brennan and Wishnie did, in fact, intend to discriminate against Back, the fact that Russell judged Brennan's and Wishnie's motives differently does not by itself constitute evidence that he also intended to discriminate.[21] As such, we hold that summary

---

questions of (a) discrimination, *see, e.g., Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) ("A finding of intentional discrimination is a finding of fact."), (b) intent, *see, e.g., Pullman–Standard v. Swint*, 456 U.S. 273,

287–90, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982), and (c) causation, *see, e.g., Joseph v. New York City Bd. of·Educ.*, 171 F.3d 87, 93 (2d Cir. 1999).

**21.** There may, of course, be instances in which reliance upon the recommendations of

judgment in favor of defendant Russell was properly granted.

### iii. Section 1983 Claim Against the School District

 Municipalities and other local government bodies, including school districts, are considered "persons" within the meaning of § 1983. *See Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 735–36, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989); *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 689, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). But a municipality cannot be held liable pursuant to § 1983 solely because of the discriminatory actions of one of its employees. *See Monell*, 436 U.S. at 691, 98 S.Ct. 2018 (rejecting *respondeat superior* liability in the § 1983 context). The District can therefore only be held liable if its "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell*, 436 U.S. at 694, 98 S.Ct. 2018.[22] Back makes no allegation that the District engaged in a "custom" of sex discrimination. There is, that is, no claim of a "relevant practice [that] is so widespread as to have the force of law" with regard to mothers of young children in positions like Back's. *See Bd. of County Comm'rs*, 520 U.S. at 404, 117 S.Ct. 1382.

 The District contends, similarly, that there is no argument to be made that it engaged in a "policy" of discrimination. In this respect it cites the fact that it has hired a disproportionately large number of women, the vast majority of whom have children. Such evidence is not dispositive, however, because the plaintiff claims she was discriminated against as an administrator. More importantly, it is clear in our Circuit that a "single unlawful discharge, if ordered by a person 'whose edicts or acts may fairly be said to represent official policy,'" can, by itself, support a claim against a municipality. *Rookard v. Health & Hosps. Corp.*, 710 F.2d 41, 45 (2d Cir. 1983); *see also Pembaur v. City of Cincinnati*, 475 U.S. 469, 480, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) ("[I]t is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances.").

 The plaintiff asserts that the Board of Education is the final policymaker in this context, and we agree. *See Pembaur*, 475 U.S. at 483, 106 S.Ct. 1292; *Rookard v. Health & Hosps. Corp.*, 710 F.2d 41, 45 (2d Cir.1983); N.Y. Educ. Law § 3012(1)(b). There is, however, no allegation that any member of the Board made discriminatory comments, or directly approved of the views allegedly held by Wishnie and Brennan. That being the case, Back must, and indeed does, contend that the Board evinced such "deliberate indifference" to the allegations of discrimination as to show that "the defendant intended the discrimination to occur." *Gant ex rel. Gant v. Wallingford Bd. of Educ.*, 195 F.3d 134, 141 (2d Cir.1999).

---

employees who have been accused of discrimination will, under the circumstances, tend to show invidious intent. But this is not that case. This conclusion is in no way inconsistent with our discussion of proximate cause, *supra*. The issue of § 1983 liability requires us to focus on what *Russell intended*, while the examination of proximate cause turns, instead, upon what actions, by Russell and others, were, for Brennan and Wishnie, foreseeable results of their purported discrimination.

**22.** To be held liable under § 1983, a municipality must also be the "moving force" behind the injury alleged. *Bd. of the County Comm'rs*, 520 U.S. at 400, 117 S.Ct. 1382. This is plainly satisfied in this case, since the District was directly responsible for the decision to terminate Back's probationary period.

But as with Superintendent Russell, Back's allegations fail to establish that the Board of Education's response to the alleged discrimination was "'clearly unreasonable in light of the known circumstances.'" (quoting *Davis*, 526 U.S. at 648, 119 S.Ct. 1661). The Board appointed an independent review panel pursuant to the Collective Bargaining Agreement between the District and the Teachers' Association to investigate Back's situation. That panel concluded that tenure denial was merited. While Back criticizes the panel's composition and procedures, none of her charges indicate that the Board was deliberately indifferent to her claims. Under the circumstances, we believe that no jury could find that the Board intended that Back suffer the effects of gender discrimination based on stereotypes. We therefore affirm the finding of the court below that no issues of material fact have been alleged which would allow a reasonable jury to hold the School District liable under § 1983.

## C. Qualified Immunity

 The justification for the common law privilege of qualified immunity has been eloquently described by Judge Learned Hand:

> It does indeed go without saying that an official, who is in fact guilty of using his powers to vent his spleen upon others, or for any other personal motive not connected with the public good, should not escape liability for the injuries he may so cause; and, if it were possible in practice to confine such complaints to the guilty, it would be monstrous to deny recovery. The justification for doing so is that it is impossible to know whether the claim is well founded until the case has been tried, and that to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome,

would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties.

*Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir.1949).

 The compromise between remedy and immunity that we have chosen turns critically upon notice. Public officials sued in their individual capacity are entitled to qualified immunity from suit unless "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). And "even assuming a state official violates a plaintiff's constitutional rights, the official is protected nonetheless if he objectively and reasonably believed that he was acting lawfully." *Luna v. Pico*, 356 F.3d 481, 490 (2d Cir. 2004). In order to prevent the margin of immunity from overshadowing our interests in recovery, however, the right in question must not be restricted to the factual circumstances under which it has been established. Thus, the Supreme Court has declined to say that "an official action is protected by qualified immunity unless the very action in question has previously been held unlawful," and has, instead, chosen a standard that excludes such immunity if "in the light of pre-existing law the unlawfulness [is] apparent." *Hope v. Pelzer*, 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002). As a result, in assessing a qualified immunity claim, we consider in particular:

(1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under

preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Jermosen v. Smith*, 945 F.2d 547, 550 (2d Cir.1991).

We find that the two remaining individual defendants in this case are not entitled to qualified immunity. It was eminently clear by 2001, when the alleged discrimination took place, both that individuals have a constitutional right to be free from sex discrimination, and that adverse actions taken on the basis of gender stereotypes can constitute sex discrimination. *See, e.g., Price Waterhouse*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268; *Weinstock*, 224 F.3d 33. It was also eminently clear that it is unconstitutional to treat men and women differently simply because of presumptions about the respective roles they play in family life. *See Weinberger v. Wiesenfeld*, 420 U.S. 636, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975). We conclude that law from this Circuit and the Supreme Court defined the right in question with the "reasonable specificity" required by law.

On the facts alleged, a jury could find that Brennan and Wishnie stereotyped the plaintiff as a woman and mother of young children, and thus treated her differently than they would have treated a man and father of young children. If that is indeed what happened, the defendants were on notice that such differential treatment was unlawful. "Although there may not have been any precedents with precisely analogous facts" prior to the instant case, "[g]iven this state of mind requirement and the well known underlying general legal principle, it is evident that the defendants knew that tolerating or engaging in disparate treatment of plaintiffs in the workplace on the basis of their sex was a violation of plaintiffs' rights." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1479–80 (3d Cir.1990) (finding no qualified immuni-

ty in a sexual harassment case brought under § 1983, although that court had not previously held that defendants were liable for sexual harassment under the Equal Protection Clause).

Defendants might have believed their stereotypes not to be gender discriminatory, but rather, to be *true*—that is, they may have believed that women with young children in fact should not or would not work long hours. But such a belief can not serve as a refuge in the discrimination context, for it cannot be considered "objectively reasonable." Indeed, as we have noted, "it can never be objectively reasonable for a governmental official to act with the intent that is prohibited by law." *Locurto v. Safir*, 264 F.3d 154, 169 (2d Cir. 2001). Because a jury could find that such specific intent existed, and because the unconstitutionality of the conduct in question was clearly established at the time of the alleged violation, qualified immunity does not shield the alleged actions of Brennan and Wishnie in this case.

*D. Conclusion*

We find that the plaintiff adduced facts sufficient to allow a jury to determine that defendants Brennan and Wishnie discriminated against Back on the basis of gender, and that qualified immunity should not attach to their behavior. Accordingly we VACATE the district court's grant of summary judgment, and REMAND the case for trial with respect to them. We also hold that no material facts support the conclusion that the School District or Superintendent Russell acted with the requisite intent to discriminate against the plaintiff. We therefore AFFIRM summary judgment as applied to these two defendants only.