**Ida PHILLIPS, Plaintiff-Appellant,**

v.

**MARTIN MARIETTA CORPORATION, Defendant-Appellee.**

No. 26825.

United States Court of Appeals
Fifth Circuit.

Oct. 13, 1969.

Reese Marshall, Jacksonville, Fla., for appellant.

David R. Cashdan, Philip B. Sklover, Attys. (Equal Employment Opportunity Commission), Washington, D. C., amici curiae.

J. Thomas Cardwell, George T. Eidson, Jr., Orlando, Fla., for appellee.

* Honorable William M. Byrne, United States District Judge, Central District of California, sitting by designation.

Before GEWIN, McGOWAN* and MORGAN, Circuit Judges.

PER CURIAM:

The Petition for Rehearing is denied and the Court having been polled at the request of one of the members of the Court and a majority of the Circuit Judges who are in regular active service not having voted in favor of it (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12), Rehearing En Banc is also denied.

Before JOHN R. BROWN, Chief Judge, and WISDOM, GEWIN, BELL, THORNBERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, DYER, SIMPSON, MORGAN, and CARSWELL, Circuit Judges.

JOHN R. BROWN, Chief Judge, with whom AINSWORTH and SIMPSON, Circuit Judges, join, dissenting:

I dissent from the Court's failure to grant rehearing en banc.[1]

## I.

Without regard to the intrinsic question of the correctness of the Court's decision and opinion, this is one of those cases within the spirit of F.R.A.P. 35 and 28 U.S.C.A. § 46 which deserves consideration by the full Court.

As the records of this Court reflect, we have within the very recent months had to deal extensively with Title VII civil rights cases concerning discrimination in employment on account of race, color, sex and religion.[2] Court decisions on critical standards are of unusual importance. This is so because, except for preliminary administrative efforts at conciliation and the rare pattern or practice suit by the United States,[3] effectuation of Congressional policies is largely committed to the hands of individual workers who take on the mantle of a private attorney general[4] to vindicate, not individual, but public rights.

This makes our role crucial. Within the proper limits of the case-and-controversy approach we should lay down standards not only for Trial Courts, but hopefully also for the guidance of administrative agents in the field, as well as employers, employees, and their representatives.

The full Court should look at the issue here posed. And now in the light of the standard erected—sex if coupled

---

* From the D.C. Circuit, sitting by designation.

1. Presumably because it was *amicus* only and not a party, the Government did not seek either rehearing or rehearing en banc. For understandable reasons the private plaintiff, Ida Phillips, who has the awesome role of private Attorney General without benefit of portfolio, or more important, an adequate purse, presumably felt that she had fulfilled her duty when the Court ruled. Subsequently, on a poll being requested. F.R.A.P. 35; 5th Circuit Rule 12, the Government filed a strong brief attacking the Court's decision. Likewise, the private plaintiff's counsel filed a persuasive brief. This merely emphasizes that it has been members of this Court, not the parties, who have raised questions about the Court's decision. This is in keeping with 28 U.S.C.A. § 46 and F.R.A.P. 35.

2. These include the following and those cited therein:
Jenkins v. United Gas Corp., 5 Cir., 1968, 400 F.2d 28; Oatis v. Crown Zellerbach Corp., 5 Cir., 1968, 398 F.2d 496; Pettway v. American Cast Iron Pipe Co., 5 Cir., 1969, 411 F.2d 998; Local 189, United Papermakers and Paperworkers, 5 Cir., 1969, 416 F.2d 980 [July 28, 1969]; United States v. Hayes Internat'l. Corp., 5 Cir., 1969, 415 F.2d 1038 [August 19, 1969]; Weeks v. Southern Bell Tel. & Tel. Co., 5 Cir., 1969, 408 F.2d 228; Dent v. St. Louis-S. F. Ry., 5 Cir., 1969, 406 F.2d 399.
Also pending before a panel of this Court are two analogous cases under § 17 of the Fair Labor Standards Act, 29 U.S.C.A. § 201 *et seq.*, involving equality of compensation to women: No. 26960, Schultz v. First Victoria Nat'l. Bank; and No. 26971, Shultz v. American Bank of Commerce.

3. See § 707(a), 42 U.S.C.A. § 2000e-6(a).

4. See Pettway v. American Cast Iron Pipe Co., note 2, *supra*, 411 F.2d at 1005; Jenkins v. United Gas Corp., note 2, *supra*, 400 F.2d at 32-33.

with another factor is acceptable—it is imperative that the full Court look at it.

## II.

Equally important, the full Court should look to correct what, in my view, is a palpably wrong standard.

The case is simple. A woman with pre-school children may not be employed, a man with pre-school children may.[5] The distinguishing factor seems to be motherhood versus fatherhood. The question then arises: Is this sex-related? To the simple query the answer is just as simple: Nobody—and this includes Judges, Solomonic or life tenured—has yet seen a male mother. A mother, to oversimplify the simplest biology, must then be a woman.

It is the fact of the person being a mother—*i. e.*, a woman—not the age of the children, which denies employment opportunity to a woman which is open to a man.

How the Court strayed from that simple proposition is not easy to define. Not a little of the reason appears to be a feeling that the Court in interpreting § 703(a) (1), 42 U.S.C.A. § 2000e-2(a) (1), prohibiting sex discrimination,[6] is bound to accept the contention of one of the parties, rather than pick and choose, drawing a middle line, or for that mat-

ter reaching independently an interpretation sponsored by no one, Thus, after noting that in the Trial Court and here the Employer did not "choose to rely on the 'bona fide occupational qualification' section of the Act,[7] but, instead, defended on the premise that their established standard of not hiring women with pre-school age children is not per se discrimination on the basis of 'sex' " (Phillips v. Martin Marietta Corp., 5 Cir., 1969, 411 F.2d 1, 2–3), the Court virtually acknowledges the patent discrimination based on biology. The Court states: "Where an employer, as here, differentiates between men with pre-school age children, on the one hand, and women with pre-school age children, on the other, there is arguably an apparent discrimination founded upon sex. It is possible that the Congressional scheme for the handling of a situation of this kind was to give the employer an opportunity to justify this seeming difference in treatment under the 'bona fide employment disqualification' provision of the statute." 411 F.2d at 4.

But in what immediately followed the Court then does a remarkable thing. Referring to EEOC (appearing only as *amicus*), it states: "The Commission, however, in its appearance before us has rejected this possible reading[8] of the

---

5. The man would qualify even though as widower or divorcé he had sole custody of and responsibility for pre-school children.

6. Section 703(a) (1) reads as follows:
   "(a) It shall be an unlawful employment practice for an employer—
   (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."
   42 U.S.C.A. § 2000e-2(a) (1).

7. Section 703(e) states:
   "(e) Notwithstanding any other provision of this subchapter, (1) it shall not be an unlawful employment practice for an employer to hire and employ employees, for an employment agency to classify, or refer for employment any

individual, for a labor organization to classify its membership or to classify or refer for employment any individual, or for an employer, labor organization, or joint labor-management committee controlling apprenticeship or other training or retraining programs to admit or employ any individual in any such program, on the basis of his religion, sex, or national origin in those certain instances where religion, sex, or national origin is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise. * * *."
42 U.S.C.A. § 2000e–2(e).

8. Such a reading is certainly not rejected by EEOC on this rehearing. The supplemental brief (pp. 9–10) recognizes the employer's right to claim and prove the § 703(e) "business necessity" exemption. (See note 7, *supra*)

statute. It has left us, if the prohibition is to be given any effect at all in this instance, only with the alternative of a Congressional intent to exclude absolutely any consideration of the differences between the normal relationships of working fathers and working mothers to their pre-school age children, and to require that an employer treat the two exactly alike in the administration of its general hiring policies. If this is the only permissible view of Congressional intention available to us, * * * we have no hesitation in choosing the latter." 411 F.2d at 4.

It is this self-imposed interpretive straightjacket which, I believe, leads the Court to the extremes of "either/or" outright per se violation with no defense or virtual complete immunity from the Act's prohibitions. This it does through its test of "sex plus": "[1] A per se violation of the Act can only be discrimination based solely on one of the categories *i. e.,* in the case of sex; women vis-a-vis men. [2] When *another* criterion of employment *is added* to one of the classifications listed in the Act, there is no longer apparent discrimination based solely on race, color, religion, sex, or national origin."[9] 411 F.2d at 3–4 (Emphasis supplied).

Reducing it to this record the Court characterizes the admitted discrimination in this way. "The discrimination was based on a *two-pronged* qualification, *i. e.,* a woman with pre-school age children. Ida Phillips was not refused employment because she was a woman nor because she had pre-school age children. It is the *coalescence* of these *two elements* that denied her the position she desired. In view of the above, we are convinced that the judgment of the District Court was proper, and we therefore affirm." 411 F.2d at 4 (Emphasis supplied).

If "sex plus" stands, the Act is dead.[10] This follows from the Court's repeated declaration[11] that the employer is not *forbidden to discriminate as to non-statutory factors.* Free to add non-sex factors, the rankest sort of discrimination against women can be worked by employers. This could include, for example, all sorts of physical characteristics, such as minimum weight (175 lbs.), minimum shoulder width, minimum biceps measurement, minimum lifting capacity (100 lbs.), and the like. Others could include minimum educational requirements (minimum high school, junior college), intelligence tests, aptitude tests, etc. And it bears repeating that on the Court's reading, one of these would constitute a complete defense to a charge of § 703(a)(1) violation *without* putting on the employer the burden of proving "business justification" under § 703(e) (note 7, *supra*).

In addition to the intrinsic unsoundness of the "sex plus" standard, the legislative history refutes the idea that Congress for even a moment meant to allow "nonbusiness justified" discrimination against women on the ground that they were mothers or mothers of pre-school children. On the contrary, mothers, working mothers, and working mothers of pre-school children were the specific objectives of governmental solicitude.

In the first place, working mothers constitute a large class[12] posing much

---

9. By supplemental brief (p. 4, n. 1) EEOC agrees with [1] on "per se" violations.

10. Of course the "plus" could not be one of the other statutory categories of race, religion, national origin, etc.

11. See, *e. g.,* "As was acknowledged in Cooper, [Cooper v. Delta Airlines, Inc., 274 F.Supp. 781 (E.D.La.1967)] *supra,* 42 U.S.C. § 2000e–2(a) does not prohibit discrimination on any classification except those named within the Act itself. Therefore, once the employer has proved that he does not discriminate against the protected groups, he is free thereafter to operate his business as he determines, hiring and dismissing other groups for any reason he desires." 411 F.2d at 4.

12. Statistics compiled by the Wage and Labor Standards Administration of the United States Department of Labor in-

discussed problems of economics and sociology. And with this large class and the known practice of using baby-sitters or child care centers, neither an employer nor a reviewing Court can—absent proof of "business justification" (note 7, *supra*)—assume that a mother of pre-school children will, from parental obligations, be an unreliable, unfit employee.[13]

In this and the related legislation on equality of *compensation* for women [14] one of the reasons repeatedly stressed for legislation forbidding sex discrimination was the large proportion of married women and mothers in the working force whose earnings are essential to the economic needs of their families.[15]

Congress could hardly have been so incongruous as to legislate sex equality

dicate that working mothers comprise an important and increasing segment of the Nation's labor resources. In the most recent compilation (March 1967), there were 10.6 million working mothers in the labor force with children under 18 years of age. This is an increase of 6 million over 1950 and an increase of 9.1 million over 1940. Of the total of working mothers in March 1967, 38.9% were mothers of children under 6 years of age and 20.7% were mothers with children under 3 years of age. In numerical terms, 4.1 million working mothers had children under 6 and 2.1 million working mothers had children under 3. Who are the Working Mothers, United States Department of Labor, Wage and Labor Standards Administration, p. 2–3 (Leaflet 37, 1968).

13. The brief of EEOC points out:
"In answering the question: 'What arrangements do working mothers make for child care?', the Department of Labor responded:
'In February 1965, 47 percent of the children under 6 years of age were looked after in their own homes and thirty percent were cared for in someone else's home, but only 6 percent received group care in day care centers or similar facilities.'
Who are Working Mothers, *supra* [Note 12].
Furthermore, it is the policy of the Administration to encourage unemployed women on public assistance, who have children, to enter the labor market by providing for the establishment of day care centers to enable them to accept offers of employment. On August 8, 1969, President Nixon stated in his address to the Nation on welfare reforms:
'As I mentioned previously, greatly expanded day-care center facilities would be provided for the children of welfare mothers who choose to work. However, these would be day-care centers with a difference. There is no single ideal to which this Administration is more firmly committed than to the enriching of a child's first five years of

life, and thus helping lift the poor out of misery, at a time when a lift can help the most. Therefore, these day-care centers would offer more than custodial care; they would also be devoted to the development of vigorous young minds and bodies. As a further dividend, the day-care centers would offer employment to many welfare mothers themselves.' Text of Nixon's Address to the Nation Outlining His Proposals for Welfare Reform, N. Y. Times, August 9, 1969, at 10, Col. 6." Brief for EEOC at 11–12.

14. Equal Pay Act of 1963, 77 Stat. 56, effective June 11, 1964, 29 U.S.C.A. § 206. See pending cases, note 2 *supra*.

15. Thus, President Kennedy, in signing the Equal Pay Act, summarized the conditions which necessitated such a law, as follows:
"[T]he average woman worker earns only 60 percent of the average wage for men * * * Our economy today depends upon women in the labor force. One out of three workers is a woman. Today, there are almost 25 million women employed, and their number is rising faster than the number of men in the labor force. It is extremely important that adequate provision be made for reasonable levels of income to them, for the care of the children * * * and for the protection of the family unit * * * *Today one out of five of these working mothers has children under three. Two out of five have children of school age. Among the remainder, about 50 percent have husbands who earn less than $5,000 a year—many of them much less. I believe they bear the heaviest burden of any group in our nation. * * * *"
[Remarks of the President at signing the Equal Pay Act on June 10, 1963, XXI Cong.Q. No. 24, p. 978 (June 14, 1963).]

At the Senate Hearings, Secretary of Labor Wirtz pointed out:
"Women's earnings, in many families, are a substantial factor in meeting liv-

in employment by a statutory structure enabling the employer to deny employment to those who need the work most through the simple expedient of adding to sex a non-statutory factor.[16]

A mother is still a woman. And if she is denied work outright because she is a mother, it is because she is a woman. Congress said that could no longer be done.

ing costs. *Married women, for example, accounted for over one-half of the total number of women workers in 1962.* Nearly 900,000 working women had husbands who, for various reasons, were not in the labor force, primarily ·because they were disabled or retired. The proportion of working wives is materially higher among families in the low-income groups." [1963 Senate Hearings, p. 16]

See also Representative Green (109 Cong.Rec. 9199) :

"There are approximately 25 million working women in the labor force today, and we are simply asking, by this legislation; to look at the facts as they face us in 1963, in instances where there is unequal pay. * * * Women are the heads of 4.6 million families in the United States; one-tenth of all the families in this country. Nearly one million working women have husbands who are not employed, mainly because they are disabled or retired. Nearly 6 million working women are single. The proportion of married women who work is materially higher in the low-income families, and, according to the testimony that was presented to the committee, some 7.5 million women workers supplement the income of male wage earners who make less than $3,000 a year. Women's wages average less than two-thirds of the wages paid men."

16. Too much emphasis cannot be given to the employer's right to claim and prove the § 703(e) "business justification" exemption (see note 7, *supra*). This was not done, but on remand it should be open to the employer here.