Justice Stevens,
concurring.
Today my appraisal of the Court’s decision in General Elec. Co. v. Gilbert, 429 U. S. 125 (1976), is the same as that expressed more than 30 years ago in my dissent. I therefore agree with much of what Justice Ginsburg has to say *717 in this case. Nevertheless, I must accept Gilbert’s interpretation of Title VII as having been the governing law until Congress enacted the Pregnancy Discrimination Act. Because this case involves rules that were in force only prior to that Act, I join the Court’s opinion.
Justice Ginsburg, with whom Justice Breyer joins, dissenting.
In General Elec. Co. v. Gilbert, 429 U. S. 125 (1976), this Court held that a classification harmful to women based on pregnancy did not qualify as discrimination “because of. .. sex” prohibited by Title VII of the Civil Rights Act of 1964. 42 U. S. C. §2000e-2(a)(l). Exclusion of pregnancy from an employer’s disability benefits plan, the Court ruled, “is not a gender-based discrimination at all.” 429 U. S., at 136. See also id., at 138 (describing G. E.’s plan as “facially nondiscriminatory” and without “any gender-based discriminatory effect”).[1] In dissent, Justice Stevens wondered how the Court could come to that conclusion, for “it is the capacity to become pregnant which primarily differentiates the female from the male.” Id., at 162.
Prior to Gilbert, all Federal Courts of Appeals presented with the question had determined that pregnancy discrimination violated Title VII.[2] Guidelines issued in 1972 by the *718 Equal Employment Opportunity Commission (EEOC or Commission) declared that disadvantageous classifications of employees based on pregnancy-related conditions are “in prima facie violation of title VII.” 37 Fed. Reg. 6837. In terms closely resembling the EEOC’s current Guideline, see 29 CFR § 1604.10 (2008), the Commission counseled:
“Written and unwritten employment policies and practices involving . . . the accrual of seniority and other benefits and privileges . . . shall be applied to disability due to pregnancy or childbirth on the same terms and conditions as they are applied to other temporary disabilities.” 37 Fed. Reg. 6837.
The history of women in the paid labor force underpinned and corroborated the views of the lower courts and the EEOC. In generations preceding — and lingering long after — the passage of Title VII, that history demonstrates, societal attitudes about pregnancy and motherhood severely impeded women’s employment opportunities. See Molnar, “Has the Millennium Yet Dawned?”: A History of Attitudes Toward Pregnant Workers in America, 12 Mich. J. Gender & L. 163, 170-176 (2005); S. Kamerman, A. Kahn, & P. Kingston, Maternity Policies and Working Women 32-38 (1983).
*719 Congress swiftly reacted to the Gilbert decision. Less than two years after the Court’s ruling, Congress passed the Pregnancy Discrimination Act of 1978 (PDA or Act) to overturn Gilbert and make plain the legislators’ clear understanding that discrimination based on pregnancy is discrimination against women.[3] The Act amended Title VII to require that women affected by pregnancy “be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work.” 42 U. S. C. §2000e(k).
The PDA does not require redress for past discrimination. It does not oblige employers to make women whole for the compensation denied them when, prior to the Act, they were placed on pregnancy leave, often while still ready, willing, and able to work, and with no secure right to return to their jobs after childbirth.[4] But the PDA does protect women, from and after April 1979, when the Act became fully effective, against repetition or continuation of pregnancy-based disadvantageous treatment.
Congress interred Gilbert more than 30 years ago, but the Court today allows that wrong decision still to hold sway. *720 The plaintiffs (now respondents) in this action will receive, for the rest of their lives, lower pension benefits than colleagues who worked for AT&T no longer than they did. They will experience this discrimination not simply because of the adverse action to which they were subjected pre-PDA. Rather, they are harmed today because AT&T has refused fully to heed the PDA’s core command: Hereafter, for “all employment-related purposes,” disadvantageous treatment “on the basis of pregnancy, childbirth, or related medical conditions” must cease. 42 U. S. C. § 2000e(k) (emphasis added). I would hold that AT&T committed a current violation of Title VII when, post-PDA, it did not totally discontinue reliance upon a pension calculation premised on the notion that pregnancy-based classifications display no gender bias.
I
Enacted as an addition to the section defining terms used in Title VII, the PDA provides:
“The terms ‘because of sex’ or ‘on the basis of sex’ include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work ....” 42 U. S. C. §2000e(k).
The text of the Act, this Court has acknowledged, “unambiguously expressed [Congress’] disapproval of both the holding and the reasoning of the Court in the Gilbert decision.” Newport News Shipbuilding & Dry Dock Co. v. EEOC, 462 U. S. 669, 678 (1983). “Proponents of the [PDA],” the Court observed, “repeatedly emphasized that the Supreme Court had erroneously interpreted congressional intent and that amending legislation was necessary to reestablish the prinei *721 pies of Title VII law as they had been understood prior to the Gilbert decision.” Id., at 679. See also California Fed. Sav. & Loan Assn. v. Guerra, 479 U. S. 272, 284-285 (1987) (explaining that “the first clause of the PDA reflects Congress’ disapproval of the reasoning in Gilbert,” while “the second clause . . . illustrate^] how discrimination against pregnancy is to be remedied”). Cf. Newport News, 462 U. S., at 694 (Rehnquist, J., dissenting) (criticizing the Court for concluding that the PDA “renders all of Gilbert obsolete”).
Today’s case presents a question of time. As the Court comprehends the PDA, even after the effective date of the Act, lower pension benefits perpetually can be paid to women whose pregnancy leaves predated the PDA. As to those women, the Court reasons, the disadvantageous treatment remains as Gilbert declared it to be: “facially nondiscriminatory,” and without “any gender-based discriminatory effect,” 429 U. S., at 138. See ante, at 710.
There is another way to read the PDA, one better attuned to Congress’ “unambiguou[s]... disapproval of both the holding and the reasoning” in Gilbert. Newport News, 462 U. S., at 678. On this reading, the Act calls for an immediate end to any pretense that classification on the basis of pregnancy can be “facially nondiscriminatory.” While the PDA does not reach back to redress discrimination women encountered before Congress overruled Gilbert, the Act instructs employers forthwith to cease and desist: Prom and after the PDA’s effective date, classifications treating pregnancy disadvantageously must be recognized, “for all employment-related purposes,” including pension payments, as discriminatory both on their face and in their impact. So comprehended, the PDA requires AT&T to pay Noreen Hulteen and others similarly situated pension benefits untainted by pregnancy-based discrimination.
II
The Court’s rejection of plaintiffs’ claims to pension benefits undiminished by discrimination “because of [their] sex,” *722 42 U. S. C. § 2000e-2(h), centers on § 703(h) of Title VII, as construed by this Court in Teamsters v. United States, 431 U. S. 324 (1977). See ante, at 707-711. Section 703(h) permits employers “to apply different standards of compensation . . . pursuant to a bona fide seniority . . . system.” 42 U. S. C. § 2000e-2(h). Congress enacted § 703(h), Teamsters explained, to “exten[d] a measure of immunity” to seniority systems even when they “operate to ‘freeze’ the status quo of prior discriminatory employment practices.” 431 U. S., at 349-350 (quoting Griggs v. Duke Power Co., 401 U. S. 424, 430 (1971)).
Teamsters involved a seniority system attacked under Title VII as perpetuating race-based discrimination. Minority group members ranked low on the seniority list because, pre-Title VII, they were locked out of the job category in question. But the seniority system itself, the Court reasoned, “did not have its genesis in . . . discrimination,” contained no discriminatory terms, and applied “equally to all races and ethnic groups,” 431 U. S., at 355-356. Therefore, the Court concluded, § 703(h) sheltered the system despite its adverse impact on minority group members only recently hired for, or allowed to transfer into, more desirable jobs. See id., at 356.
This case differs from Teamsters because AT&T’s seniority system itself was infected by an overt differential. Cf. ante, at 710 (“[R]ule of differential treatment was an element of the seniority system itself____”). One could scarcely maintain that AT&T’s scheme was “neutral on [its] face and in intent,” discriminating against women only “in effect.” Cf. Teamsters, 431 U. S., at 349. Surely not a term fairly described as “equally [applicable] to all,” id., at 355, AT&T’s prescription regarding pregnancy leave would gain no immunity under § 703(h) but for this Court’s astonishing declaration in Gilbert: “[Exclusion of pregnancy from a disability-benefits plan providing general coverage,” the Court decreed, “[was] not a gender-based discrimination at all.” 429 U. S., at 136. See ante, at 710 (because of Gilbert, *723 AT&T’s disadvantageous treatment of pregnancy leave “did not taint the system under the terms of [§ 703(h)]”).
Were the PDA an ordinary instance of legislative revision by Congress in response to this Court’s construction of a statutory text, I would not dissent from today’s decision. But Congress made plain its view that Gilbert was not simply wrong about the character of a classification that treats leave necessitated by pregnancy and childbirth disadvantageously. In disregarding the opinions of other courts, see supra, at 717-718, n. 2, of the agency that superintends enforcement of Title VII, see supra, at 717-718,[5] and, most fundamentally, the root cause of discrimination against women in the paid labor force, this Court erred egregiously. Congress did not provide a remedy for pregnancy-based discrimination already experienced before the PDA became effective. I am persuaded by the Act’s text and legislative history, however, that Congress intended no continuing reduction of women’s compensation, pension benefits included, attributable to their placement on pregnancy leave.
Ill
A few further considerations influence my dissenting view. Seeking equal treatment only from and after the PDA’s effective date, plaintiffs present modest claims. As the Court observes, they seek service credit, for pension benefit purposes, for the periods of their pregnancy leaves. For the named plaintiffs, whose claims are typical, the uncounted leave days are these: “seven months ... for Noreen Hulteen; *724 about six months for Eleanora Collet; and about two for Elizabeth Snyder and Linda Porter.” Ante, at 706. See also 498 F. 3d 1001, 1004 (CA9 2007) (en banc) (case below). Their demands can be met without disturbing settled expectations of other workers, the core concern underlying the shelter § 703(h) provides for seniority systems. See Franks v. Bowman Transp. Co., 424 U. S. 747, 766, 773, and n. 33 (1976) (“ ‘benefit’ seniority,” unlike “ ‘competitive status’ seniority,” does not conflict with economic interests of other employees).
Furthermore, as Judge Rymer explained in her opinion dissenting from the Ninth Circuit’s initial panel opinion, 441 F. 3d 653, 665-666 (2006), the relief plaintiffs request is not retroactive in character. Plaintiffs request no backpay or other compensation for past injury. They seek pension benefits, now and in the future, equal to the benefits received by others employed for the same length of time. The actionable conduct of which they complain is AT&T’s denial of equal benefits to plaintiffs “in the post-PDA world.” Id., at 667.
Nor does it appear that equal benefits for plaintiffs during their retirement years would expose AT&T to an excessive or unmanageable cost. The plaintiffs’ class is not large; it comprises only women whose pregnancy leaves predated April 29,1979 and whose employment continued long enough for their pensions to vest. The periods of service involved are short — several weeks or some months, not years. And the cost of equal treatment would be spread out over many years, as eligible women retire.
IV
Certain attitudes about pregnancy and childbirth, throughout human history, have sustained pervasive, often law-sanctioned, restrictions on a woman’s place among paid workers and active citizens. This Court so recognized in Nevada Dept. of Human Resources v. Hibbs, 538 U. S. 721 (2003). Hibbs rejected challenges, under the Eleventh and *725 Fourteenth Amendments, to the Family and Medical Leave Act of 1993, 107 Stat. 6, 29 U. S. C. § 2601 et seq., as applied to state employees. The Court’s opinion featured Congress’ recognition that,
“[historically, denial or curtailment of women’s employment opportunities has been traceable directly to the pervasive presumption that women are mothers first, and workers second. This prevailing ideology about women’s roles has in turn justified discrimination against women when they are mothers or mothers-to-be.” Joint Hearing before the Subcommittee on Labor-Management Relations and the Subcommittee on Labor Standards of the House Committee on Education and Labor, 99th Cong., 2d Sess., 100 (1986) (quoted in Hibbs, 538 U S., at 736).[6]
Several of our own decisions, the opinion in Hibbs acknowledged, 538 U. S., at 729, exemplified the once “prevailing ideology.” As prime illustrations, the Court cited Bradwell v. State, 16 Wall. 130 (1873);[7] Muller v. Oregon, 208 U. S. 412 (1908);[8] Goesaert v. Cleary, 335 U. S. 464 (1948);[9] and *726 Hoyt v. Florida, 368 U. S. 57 (1961).[10] The Hibbs opinion contrasted Muller, Goesaert, and Hoyt with more recent opinions: Commencing in 1971, the Court had shown increasing awareness that traditional sex-based classifications confined or depressed women’s opportunities. 538 U. S., at 728-730. Representative of the jurisprudential change, Hibbs cited Reed v. Reed, 404 U. S. 71 (1971);[11] Frontiero v. Richardson, 411 U. S. 677 (1973);[12] Craig v. Boren, 429 U. S. 190 (1976);[13] and United States v. Virginia, 518 U. S. 515 (1996).[14]
Gilbert is aberrational not simply because it placed outside Title VII disadvantageous treatment of pregnancy rooted in “stereotype-based beliefs about the allocation of family duties,” Hibbs, 538 U. S., at 730; Gilbert also advanced the strange notion that a benefits classification excluding some women (“pregnant women”) is not sex based because other women are among the favored class (“nonpregnant persons”).[15] The very first Title VII sex-discrimination case heard by the Court, Phillips v. Martin Marietta Corp., 400 U. S. 542 (1971) (per curiam), however, rejected similar reasoning. At issue in Phillips was an employer’s refusal to *727 hire mothers of pre-school-age children. Phillips yielded a per curiam opinion recognizing that Title VII applies to classifications disadvantageous to some, but not most, women. See, e. g., Phillips v. Martin Marietta Corp., 416 F. 2d 1257, 1262 (CA5 1969) (Brown, C. J., dissenting from denial of en banc review) (“A mother is still a woman. And if she is denied work outright because she is a mother, it is because she is a woman. Congress said that could no longer be done.”); Sprogis v. United Air Lines, Inc., 444 F. 2d 1194 (CA7) (refusal to employ married women violates Title VII), cert. denied, 404 U. S. 991 (1971).[16]
Grasping the connection Gilbert failed to make, a District Court opinion pre-Gilbert, Wetzel v. Liberty Mut. Ins. Co., 372 F. Supp. 1146 (WD Pa. 1974), published this deft observation. In response to an employer’s argument that its disadvantageous maternity leave and pregnancy disability income protection policies were not based on sex, the court commented: “[I]t might appear to the lay mind that we are treading on the brink of a precipice of absurdity. Perhaps the admonition of Professor Thomas Reed Powell to his law students is apt; Tf you can think of something which is inextricably related to some other thing and not think of the other thing, you have a legal mind.’” Id., at 1157.
Congress put the Court back on track in 1978 when it amended Title VII to repudiate Gilbert's holding and reasoning. See Newport News, 462 U. S., at 678; California Fed., *728 479 U. S., at 284-285; supra, at 720-721.[17] Congress’ swift and strong repudiation of Gilbert, the Court today holds, does not warrant any redress for the plaintiffs in this case. They must continue to experience the impact of their employer’s discriminatory — but, for a short time, Gilbert-blessed — plan. That outcome is far from inevitable. It is at least reasonable to read the PDA to say, from and after the effective date of the Act, no woman’s pension payments are to be diminished by the pretense that pregnancy-based discrimination displays no gender bias.
I would construe the Act to embrace plaintiffs’ complaint, and would explicitly overrule Gilbert so that the decision can generate no more mischief.
* * *
For the reasons stated, I would affirm the Ninth Circuit’s judgment.

 The Court’s opinion in Gilbert extended to Title VII reasoning earlier advanced in Geduldig v. Aiello, 417 U. S. 484 (1974). In that case, the Court upheld against an equal protection challenge California’s disability insurance system, which excluded coverage for disabilities occasioned by normal pregnancy. California’s system, the Court noted, did not divide workers according to their sex; instead, it “divide[d] potential recipients into two groups — pregnant women and nonpregnant persons.” Id., at 496-497, n. 20.

 See Communications Workers of America v. AT&T Co., Long Lines Dept., 513 F. 2d 1024 (CA2 1975); Wetzel v. Liberty Mut. Ins. Co., 511 F. 2d 199 (CA3 1975), vacated on other grounds and remanded, 424 U. S. 737 (1976); Gilbert v. General Elec. Co., 519 F. 2d 661 (CA4 1975), rev’d, 429 U. S. 125 (1976); Satty v. Nashville Gas Co., 522 F. 2d 850 (CA6 1975), aff’d in part, vacated in part, and remanded, 434 U. S. 136 (1977); Holthaus v. *718 Compton & Sons, Inc., 514 F. 2d 651 (CA8 1975); Berg v. Richmond Unified School Dist., 528 F. 2d 1208 (CA9 1975); Hutchison v. Lake Oswego School Dist. No. 7, 519 F. 2d 961 (CA9 1975).
For decisions under state human rights laws to the same effect, see, e. g., Brooklyn Union Gas Co. v. New York State Human Rights Appeal Bd., 41 N. Y. 2d 84, 359 N. E. 2d 393 (1976); Anderson v. Upper Bucks Cty. Area Vocational Technical School, 30 Pa. Commw. 103, 373 A. 2d 126 (1977); Quaker Oats Co. v. Cedar Rapids Human Rights Comm’n, 268 N. W. 2d 862 (Iowa 1978); Massachusetts Elec. Co. v. Massachusetts Comm’n Against Discrimination, 375 Mass. 160, 375 N. E. 2d 1192 (1978); Minnesota Min. & Mfg. Co. v. State, 289 N. W. 2d 396 (Minn. 1979); Michigan Dept. of Civil Rights ex rel. Jones v. Michigan Dept. of Civil Serv., 101 Mich. App. 295, 301 N. W. 2d 12 (1980); Badih v. Myers, 36 Cal. App. 4th 1289, 43 Cal. Rptr. 2d 229 (1995).

 See, e.g., H. R. Rep. No. 95-948, p. 3 (1978) (“[T]he assumption that women will become pregnant and leave the labor force ... is at the root of the discriminatory practices which keep women in low-paying and dead-end jobs.”).

 For examples of once prevalent restrictions, see Turner v. Utah Dept. of Employment Security, 423 U. S. 44 (1975) (per curiam) (state statute made pregnant women ineligible for unemployment benefits for a period extending from 12 weeks before the expected date of childbirth-until six weeks after childbirth); Cleveland Bd. of Ed. v. LaFleur, 414 U. S. 632, 634-635 (1974) (school board rule forced pregnant public school teachers to take unpaid maternity leave five months before the expected date of childbirth, with no guarantee of reemployment). Cf. Nevada Dept. of Human Resources v. Hibbs, 538 U. S. 721, 736-737 (2003) (sex discrimination, Congress recognized, is rooted, primarily, in stereotypes about “women when they are mothers or mothers-to-be” (internal quotation marks omitted)).

 The Equal Employment Opportunity Commission’s (EEOC) current compliance manual counsels: “While the denial of service credit to women on maternity leave was not unlawful when [the charging party] took her leave . . . , the employer’s decision to incorporate that denial of service credit in calculating seniority [post-PDA] is discriminatory.” 2 EEOC Compliance Manual §3, Pt. III(B), p. 627:0023 (effective Oct. 3, 2000). EEOC compliance manuals, this Court has recognized, “reflect ‘a body of experience and informed judgment to which courts and litigants may properly resort for guidance.’ ” Federal Express Carp. v. Holowecki, 552 U. S. 389, 399 (2008) (quoting Bragdon v. Abbott, 524 U. S. 624, 642 (1998)).

 See also H. R. Rep. No. 95-948, pp. 6-7 (“Women are still subject to the stereotype that all women are marginal workers. Until a woman passes the child-bearing age, she is viewed by employers as potentially pregnant.”).

 Bradwell upheld a State’s exclusion of women from the practice of law. In an exorbitant concurring opinion, Justice Bradley wrote that “the female sex [is] evidently unfijt]... for many of the occupations of civil life.” 16 Wall., at 141. He elaborated: “The paramount destiny and mission of woman are to fulfil the noble and benign offices of wife and mother. This is the law of the Creator.” Ibid.

 Muller upheld a State’s hours-of-work limitation applicable to women only. “[T]o preserve the strength and vigor of the race,” the Court observed, “the physical well-being of woman becomes an object of public interest and care.” 208 U. S., at 421. Cf. Automobile Workers v. Johnson Controls, Inc., 499 U. S. 187, 211 (1991) (“Concern for a woman’s existing or potential offspring historically has been the excuse for denying women equal employment opportunities.”).

 Goesaert upheld a state law prohibiting women from working as bartenders (unless the woman’s husband or father owned the tavern).

 Hoyt sustained a state law exempting all women from the obligation to serve on juries.

 Reed invalidated a state law that preferred males to females for appointment as estate administrators.

 Frontiero extended to married female members of the uniformed services spousal benefits granted by statute automatically only to male members.

 Craig held that young men were entitled to purchase 3.2% beer at the same age as young women.

 Virginia, the Court held, could not maintain the Virginia Military Institute as an all-male college without offering women a genuinely equal educational opportunity. For a fuller account of the Court’s decisions on the constitutionality of gender-based classifications, see Virginia, 518 U. S., at 531-534.

 The terms “pregnant women” and “nonpregnant persons” first appeared in Geduldig, 417 U. S., at 496-497, n. 20. See supra, at 717, n. 1. Gilbert repeated the terms, quoting the footnote in Geduldig, 429 U. S., at 135.

 See also the EEOC’s Guideline, initially published in 1965, and now codified in 29 CFR § 1604.4 (2008):
“The Commission has determined that an employer’s rule which forbids or restricts the employment of married women and which is not applicable to married men is a discrimination based on sex prohibited by Title VII of the Civil Rights Act. It does not seem to us relevant that the rule is not directed against all females, but only against married females, for so long as sex is a factor in the application of the rule, such application involves a discrimination based on sex.” 30 Fed. Reg. 14928 (1965).

 For critical commentary on Gilbert and its forerunner, Geduldig v. Aiello, see, e. g., Bartlett, Pregnancy and the Constitution: The Uniqueness Trap, 62 Calif. L. Rev. 1532, 1551-1566 (1974); Eskridge, America’s Statutory “constitution,” 41 U. C. D. L. Rev. 1, 39-40, and n. 175 (2007); Karst, The Supreme Court 1976 Term Foreword: Equal Citizenship Under the Fourteenth Amendment, 91 Harv. L. Rev. 1, 54, n. 304 (1977); Law, Rethinking Sex and the Constitution, 132 U. Pa. L. Rev. 955, 983-984, and nn. 107-109 (1984); Roelofs, Sex Discrimination and Insurance Planning: The Rights of Pregnant Men and Women Under General Electric Co. v. Gilbert, 22 St. Louis U. L. J. 101, 120-123 (1978); Schwartz, Equalizing Pregnancy: The Birth of a Super-Statute 33-57 (2005), http://lsr.nelleo.org/ yale/ylsspps/papers/41 (as visited May 14, 2009, and in Clerk of Court’s case file); Siegel, Reasoning From the Body: A Historical Perspective on Abortion Regulation and Questions of Equal Protection, 44 Stan. L. Rev. 261, 268-272 (1992); Siegel, You’ve Come a Long Way, Baby: Rehnquist’s New Approach to Pregnancy Discrimination in Hibbs, 58 Stan. L. Rev. 1871,1873,1878,1891-1893 (2006); Taub & Williams, Will Equality Require More Than Assimilation, Accommodation or Separation From the Existing Social Structure? 37 Rutgers L. Rev. 825, 832-836 (1985).