Cynthia McGRATH, Individually and as Administratrix ad Prosequendum of the Estate of Megan Wright, Plaintiff,

v.

DOMINICAN COLLEGE OF BLAUVELT, NEW YORK, Sister Mary Eileen O'Brien, Individually and as President of Dominican College, John Lennon, Individually and as Director of Security of Dominican College, John Prescott, Individually and as Dean of Students of Dominican College, Carlyle Hicks, Individually and as Director of Resident Life of Dominican College, Richard Fegins, Jr., Kenneth A. Thorne, Jr., Isaiah Lynch, and Terrell E. Hill, Defendants.

No. 07 Civ. 11279.

United States District Court, S.D. New York.

Nov. 25, 2009.

Kirkpatrick & Lockhart Preston, Gates Ellis LLP, by Andrew L. Morrison, Esq., Sarah P. Kenney, Esq., New York, NY, Allred, Maroko & Goldberg, by Gloria Allred, Esq., Los Angeles, CA, Sullivan & Worcester LLP, by Nathan A. Goldberg, Esq., K & L Gates LLP, by Sarah Peck Kenney, Esq., New York, NY, for Plaintiff.

Biedermann, Reif, Hoenig & Ruff, P.C., by Philip R. Semprevivo, Jr., Esq., Peter W. Beadle, Esq., New York, NY, for Defendants Dominican College of Blauvelt, New York, Sister Mary Eileen O'Brien, John Lennon, John Prescott, and Carlyle Hicks.

Samimi and Murphy, by Kenneth J. Murphy, Esq., New City, NY, for Defendant, Richard Fegins, Jr.

Manatt, Phelps & Phillips, LLP, by Arunabha Bhoumik, Esq., Elizabeth Murray, Esq., New York, NY, for Defendant, Kenneth A. Thorne.

Lewis Brisbois Bisgaard & Smith LLP, by Karen L. Campbell, Esq., New York, NY, for Defendant, Isaiah Lynch.

## OPINION

SWEET, District Judge.

The defendant Dominican College (the "College") has moved to dismiss plaintiff's Title IX, 42 USC § 1983, fraud, and intentional infliction of emotional distress claims against it in the Amended Complaint of the plaintiff, Cynthia McGrath, Individually and as Administratrix of the Estate of Megan Wright ("McGrath" or the "Plaintiff") pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the defendants Sister Mary Eileen O'Brien ("President O'Brien"), John Lennon ("Director Lennon"), John Prescott ("Dean Prescott") and Carlyle Hicks ("Resident Director Hicks") (collectively, the "Individual Defendants" or the "College Defendants") now have moved to dismiss the Plaintiff's Amended Complaint in its entirety. Upon the conclusions set forth below, the motion of the College is denied, and the motion of the Individual Defendants is also denied.

### Prior Proceedings

The complaint was filed by McGrath on December 14, 2007. The Amended Complaint (the "AC") was filed on January 29, 2008.

The AC alleged eight causes of action: First Cause of Action (Violation of Title IX against Dominican College); Second Cause of Action (Premises Liability against Dominican College); Third Cause of Action (Negligence against Dominican College and Individual Defendants O'Brien, Lennon, Prescott and Hicks); Fourth Cause of Action (Breach of Contract against Dominican College); Fifth Cause of Action (Intentional Infliction of Emotion Distress against Dominican College and the Individual Defendants); Sixth Cause of Action (Fraud against Dominican College and Defendants); Seventh Cause of Action (Deprivation of Federally Secured Rights against Dominican College and Defendants); and Eighth Cause of Action (Wrongful Death against Dominican College and, inter alia, the Individual Defendants).

The AC alleged as follows:

McGrath is the mother of Megan Wright ("Ms. Wright") and is both the Administratrix Ad Prosequendum and the General Administratrix of the Estate of Megan K. Wright. (Am. Comp. ¶ 10). McGrath is also Megan Wright's sole distributee. (Am. Comp. ¶ 10). Ms. Wright enrolled as a freshman at Dominican College for the 2005/2006 school year (Am. Comp. ¶ 11) and lived on campus during her freshman year. (Am. Comp. ¶ 11).

The College is a private institution of learning that receives federal funding and is located in Orangeburg, New York. (Am. Comp. ¶ 12). President O'Brien was the President of Dominican College. (Am. Comp. ¶ 13). Director Lennon was the Director of Security of Dominican College. (Am. Comp. ¶ 14). Dean Prescott at all times relevant to this lawsuit was the Dean of Students of Dominican College. (Am. Comp. ¶ 15). Resident Director Hicks at all times relevant to this lawsuit was the Director of Resident Life for Dominican College (Am. Comp. ¶ 16).

Ms. Wright matriculated as a full-time freshman student at Dominican College in late August 2005. (Am. Comp. ¶ 23). She was assigned to live on campus in a Residence Hall known as Hertel Hall. (Am. Comp. ¶ 31). Among the documents received by Ms. Wright upon her arrival was

Dominican College's Code of Conduct for its students (the "Code of Conduct"). (Am. Comp. ¶¶ 32, 33). The Code of Conduct acknowledged Dominican College's "obligation" to "protect" its students and specifically stated that Dominican College "accepts its obligation to provide for its members an atmosphere that protects and promotes its educational mission and which guarantees its orderly and effective operation." (Am. Comp. ¶ 35).

The Code of Conduct also states, in pertinent part:

Dominican College does not recognize a victim's signed consent, waiver, or release as an absolute defense to a claim of sexual assault.

(Am. Comp. ¶ 40).

In April 2006, a female student was sexually assaulted in a Dominican College campus Residence Hall, in a similar manner to the subsequent attack on Ms. Wright. (Am. Comp. ¶ 49). Dominican College failed to investigate this April 2006 assault. (Am. Comp. ¶ 50). The school's only response was to hold a non-mandatory student meeting that lasted no more than five minutes. (Am. Comp. ¶ 50). In addition, Dominican College steered the victim of that assault to the same Orangetown police detective who would later handle Ms. Wright's complaint. (Am. Comp. ¶ 51). This detective was severely conflicted due to his relationship with Dominican College where he was an instructor; he did not pursue either investigation. (Am. Comp. ¶ 51). Dominican College failed to disclose the report of the April 2006 assault in violation of federal law, including the Clery Act, 20 U.S.C. § 1092. (Am. Comp. ¶ 53). Based upon Domini can College's conduct in response to both the April 2006 assault and the assault on Ms. Wright, and upon information and belief, Dominican College failed to disclose other reported sexual assaults occurring on campus prior to Ms. Wright's attendance at the school. (Am. Comp. ¶ 188).

On or about May 7, 2006, Ms. Wright was raped by defendants Richard Fegins, Jr., Isaiah Lynch, and Kenneth A. Thorne, Jr. in a Resident Hall of the College. (Am. Comp. ¶ 55). At that time, Defendants Fegins and Lynch were students at the school and Defendant Thorne was a guest. (Am. Comp. ¶ 55). The attack occurred after a late night party in Ms. Wright's campus Residence Hall during which students were openly consuming alcoholic beverages in violation of school policy. (Am. Comp. ¶ 56). Upon leaving the party, Ms. Wright returned to her room. (Am. Comp. ¶ 57). Before she could open the door to her room, Defendants Terrell E. Hill and Kenneth A. Thorne, Jr. (who had followed Ms. Wright from the party to her room) physically turned her around, and brought her to another room. (Am. Comp. ¶ 57). Defendant Thorne led Ms. Wright into the second room and raped her. (Am. Comp. ¶ 58). Shortly thereafter, Defendants Fegins and Lynch appeared, and Defendant Thorne allowed them access to the room. (Am. Comp. ¶ 59). Upon entering the room, Fegins and Lynch each raped Ms. Wright. (Am. Comp. ¶ 60). Throughout the assault on Ms. Wright, several male students congregated outside the room where the assault was occurring. (Am. Comp. ¶ 61). Several students were peeking into the room when the door opened for the attackers' ingress and egress and were "high fiving" one another at various times during the assault. (Am. Comp. ¶ 61).

While Ms. Wright was still in the room, one of the assailants exited the room and held up a white sign, which purportedly contained her signature, to the surveillance cameras so that the camera could pick up the words printed on the sign above the

signature: "I WANT TO HAVE SEX". (Am. Comp. ¶ 62).

Ms. Wright awoke the next morning, May 8, 2006, believing that something was wrong. (Am. Comp. ¶ 66). She had a vague recollection of the events of the previous evening; she noticed that she was wearing different clothes and was sore and bleeding in the vaginal area. (Am. Comp. ¶ 66).

Ms. Wright asked a friend to take her to White Plains Hospital for purposes of having a rape kit and SANE[1] examination performed. (Am. Comp. ¶ 67). The examination confirmed that substantial injuries, including bruising and lacerations, indicated forced rape. (Am. Comp. ¶ 68). The SANE nurse on duty that day, in fifteen years of practice, had rarely seen a victim evincing more physical trauma than Ms. Wright. (Am. Comp. ¶ 69).

Ms. Wright promptly informed the College of the sexual assault that occurred on May 7, 2006. (Am. Comp. ¶ 70). Dean Prescott referred her to the Orangetown police department, but failed to mention to her that there were other campus procedures for filing complaints. (Am. Comp. ¶ 71). Dean Prescott did not offer any further assistance to Ms. Wright aside from suggesting that she obtain counseling from the school's therapist. (Am. Comp. ¶ 71).

In fact, no accommodations were made for Ms. Wright. (Am. Comp. ¶ 72). The school did not reassign her room in the Residence Halls. (Am. Comp. ¶ 72). The school denied Ms. Wright's requests to take her final exams at a different location using exam proctors. (Am. Comp. ¶ 72). Despite her attempts to do so, Ms. Wright was unable to take her final exams. (Am. Comp. ¶ 73).

Ms. Wright repeatedly sought assistance from the College only to be told that the College would neither take any action nor conduct its own independent investigation until the conclusion of the criminal investigation undertaken by the Orangetown police department. (Am. Comp. ¶ 74).

It took over a month from the date of the attack for Dean Prescott to view the security videotape taken from the Residence Hall. (Am. Comp. ¶ 75). This tape showed Ms. Wright being followed into a Residence Hall room, the entrance into that room by her three alleged assailants, and the presence of another group of men gathered outside the door of that room. (Am. Comp. ¶ 75). Ms. Wright and her mother, McGrath, met with the Dean Prescott in June and were told that Ms. Wright's complaint would be "difficult to prove." (Am. Comp. ¶ 76). Dean Prescott discouraged Megan from pursuing a complaint through the school. (Am. Comp. ¶ 76).

The College directed Ms. Wright to pursue the criminal investigation with a detective in the Orangetown police department who, unbeknownst to Ms. Wright at the time, was employed by Dominican College as an instructor. (Am. Comp. ¶ 78). She met with the detective on or about May 15, 2006, after her final exams period. (Am. Comp. ¶ 80). She gave the detective the underwear and other articles of clothing that she had worn during the night of the rape; those items included samples of her blood. (Am. Comp. ¶ 80). The detective interviewed Ms. Wright alone for approximately 20 minutes. (Am. Comp. ¶ 80).

---

1. "SANE" is the abbreviation for Sexual Assault Nurse Examiner Program, which provides direct patient care to victims of sexual assault. Participants of SANE deliver coordinated, expert forensic and medical care necessary to increase successful prosecution of sex offenders and to assure essential medical intervention to victims of assault.

Although the detective promised to report the results of a preliminary investigation within 10 days, neither Ms. Wright nor McGrath heard from the detective over the following few weeks. (Am. Comp. ¶ 81). During its alleged "investigation," the police department did not investigate the room where Ms. Wright alleged she was attacked. (Am. Comp. ¶ 82). When asked why the Police department did not investigate the room, the detective told McGrath that "they only do that on TV". (Am. Comp. ¶ 82). The Police department did not treat that room as a crime scene. (Am. Comp. ¶ 82). Nor did they gather any evidence from that room. (Am. Comp. ¶ 82). No one from the Orangetown police department visited that room in connection with any investigation of Ms. Wright's allegations. (Am. Comp. ¶ 82).

The detective failed to contact either Ms. Wright or McGrath for weeks during the summer of 2006. (Am. Comp. ¶ 83). Concerned by this sustained period of silence, McGrath called the detective. (Am. Comp. ¶ 83). During that call, the detective asked to meet with Ms. Wright and McGrath. (Am. Comp. ¶ 83). When they later met, the detective viewed with Ms. Wright and her mother the surveillance videotape taken from the Residence Hall on the night of the attack. (Am. Comp. ¶ 83).

The detective at that time indicated that he was aware of another reported sexual assault that occurred on campus in April 2006. (Am. Comp. ¶ 84). The detective was aware of the April 2006 assault because the school had steered the victim of that assault to him. (Am. Comp. ¶ 85).

After the attack on Ms. Wright, one of the alleged assailants had—on his own volition—visited the office of the Orangetown police department to claim that he had consensual sex with Ms. Wright and indicated that she had printed the sign "I WANT TO HAVE SEX" and signed it prior to the assault. (Am. Comp. ¶ 90). The detective took a writing sample from Ms. Wright by asking her to write on a similarly sized piece of paper the words: "I WANT TO HAVE SEX." (Am. Comp. ¶ 86). The detective retained this sample from Ms. Wright. (Am. Comp. ¶ 86). In his police report, the detective later indicated that his refusal to investigate the assault was due, at least in part, to the fact that he believed that Ms. Wright's handwriting matched the writing on that sign. (Am. Comp. ¶ 86). Neither the police nor the school made a finding about whether Ms. Wright was compelled or threatened to write on the sign, whether any of her assailants held or forced her hand or whether Ms. Wright possessed a competent mental state to knowingly give her consent.

In June 2006, McGrath and Ms. Wright met with Dean Prescott at Dominican College. (Am. Comp. ¶ 92). At that time, he indicated that the police investigation was proceeding but no independent school investigation had occurred. (Am. Comp. ¶ 92). Dean Prescott conceded that he still had not viewed the hallway videotape and that he had not conducted any interviews with the alleged assailants. (Am. Comp. ¶ 92). He indicated that he was awaiting additional information from the detectives at the Orangetown police department. (Am. Comp. ¶ 92).

McGrath asked Dean Prescott if the alleged assailants would be suspended from school. He indicated that there would be no such suspensions. (Am. Comp. ¶ 93). McGrath informed him that Ms. Wright would have to withdraw from school due to fear for her safety. (Am. Comp. ¶ 93).

After the meeting with Dean Prescott, McGrath and Ms. Wright requested a meeting with President O'Brien. President O'Brien refused to meet with either

McGrath or Ms. Wright. (Am. Comp. ¶ 94). The College never communicated either a written or verbal report of any investigation to either McGrath or Ms. Wright. (Am. Comp. ¶ 95). Ms. Wright and her mother told Dean Prescott that Ms. Wright was fearful of another attack if she returned to school. The College offered no accommodation. (Am. Comp. ¶ 96). Ms. Wright did not return to campus for the fall semester of the 2006/2007 school year. (Am. Comp. ¶ 97).

Ms. Wright took her own life in December 2006 in her own bedroom with her mother and brother in the house. (Am. Comp. ¶ 104).

The instant motions seeking dismissal of the AC were made on January 29, 2008, and the reply memorandum was filed on April 10, 2008. Oral argument was heard on October 30, 2008. The action was reassigned to this court on June 5, 2009.

### *The Applicable Standards*

#### A. *Rule 9(b)*

Rule 9(b), Fed.R.Civ.P., provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." *Id.* The Second Circuit "has read Rule 9(b) to require that a complaint [alleging fraud] '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Rombach v. Chang,* 355 F.3d 164, 170 (2d Cir.2004) (quoting *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir.1993)). *See, e.g., Ouaknine v. MacFarlane,* 897 F.2d 75, 79 (2d Cir.1990), *cert. denied,* 502 U.S. 921, 112 S.Ct. 332, 116 L.Ed.2d 272 (1991); *Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir.1989); *Center*

*Savings & Loan Association v. Prudential–Bache Securities Inc.,* 679 F.Supp. 274, 277 (S.D.N.Y.1987).

Rule 9(b) is designed to ensure that a defendant is informed sufficiently of the allegations against him such that he is in a position to answer the complaint and prepare a defense. *Klein v. Computer Devices, Inc.,* 591 F.Supp. 270, 279 n. 27 (S.D.N.Y.1984), *accord Spear, Leeds & Kellogg v. Public Service Co. of New Hampshire,* 700 F.Supp. 791, 793 (S.D.N.Y.1988) (complaint was sufficient because it gave "fair and reasonable notice to defendants of the claim and the grounds upon which it is based, thus satisfying one of the main purposes of Rule 9(b)"); *Conan Properties, Inc. v. Mattel, Inc.,* 619 F.Supp. 1167, 1173 (S.D.N.Y.1985) ("[d]efendant is on sufficient notice of what [plaintiff] is charging").

In the Second Circuit, the pleading standard for scienter is satisfied "'(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" *Ganino v. Citizens Utilities Co.,* 228 F.3d 154, 168–69 (2d Cir.2000) (*quoting Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1129–30 (2d Cir.1994)).

#### B. *Rule 12(b)(6)*

On a motion to dismiss pursuant to Rule 12, all factual allegations are accepted as true, and all inferences are drawn in favor of the pleader. *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1174 (2d Cir.1993). The issue "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir.1995) (quoting *Scheuer v. Rhodes,* 416 U.S. 232,

235–36, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)).

■ However, while the pleading standard set forth in Rule 8 of the Fed. R.Civ.P. is a liberal one,

> the pleading standard Rule 8 announces ... demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. A pleading that offers labels and conclusion or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement.

*Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (internal cites and quotes omitted). Thus, a complaint must allege sufficient factual matter to "state a claim to relief that is plausible on its face," *Id.* (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). In meeting this "plausibility standard," the plaintiff must demonstrate more than a "sheer possibility" of unlawful action; pleading facts that are " 'merely consistent with' a defendant's liability ... 'stops short of the line between possibility and plausibility of entitlement to relief.' " *Id.* (quoting *Twombly,* 550 U.S. at 557, 127 S.Ct. 1955); *see also Reddington v. Staten Island Univ. Hosp.,* 511 F.3d 126, 131 (2d Cir.2007) ("Although the pleading standard is a liberal one, bald assertions and conclusions of law will not suffice. To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient to raise a right to relief above the speculative level." (internal quotes and cites omitted)); *Gavish v. Revlon, Inc.,* No. 00–CV–7291, 2004 WL 2210269, at *10 (S.D.N.Y. Sept. 30, 2004) ("[B]ald contentions, unsupported characterizations, and legal conclusions are not well-pleaded allegations and will not defeat a motion to dismiss.").

## The Allegation of Deliberate Indifference Under Title IX is Adequate

In pleading a cause of action under Title IX (*see* 20 U.S.C. §§ 1681–1688), the First Cause of Action of the Amended Complaint has alleged that Dominican College failed to implement policies and procedures related to the handling of reports of sexual assault as required by Title IX.

Title IX provides, in pertinent part:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subject to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a).

■ Title IX is enforceable through an implied private right of action seeking monetary damages. *See Franklin v. Gwinnett County Pub. Schs.,* 503 U.S. 60, 65, 76, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992). Sexual harassment is considered discrimination in the school context under Title IX, and a plaintiff may recover for student on student harassment, if the plaintiff can demonstrate four elements:

(1) defendant is a Title IX funding recipient;

(2) an appropriate person has actual knowledge of the discrimination or harassment the plaintiff alleges occurred;

(3) the funding recipient has acted with deliberate indifference to known acts of harassment; and

■ (4) the discrimination is so severe, pervasive and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit. *See Williams v. Bd. of Regents of the Univ. Sys. of Georgia,* 477 F.3d 1282, 1293 (11th Cir.2007). Courts will find deliberate indifference where a plaintiff demonstrates

that the school's response to the harassment or its lack of response is "clearly unreasonable in light of the known circumstances." *Davis v. Monroe County Bd. of Educ.,* 526 U.S. 629, 648, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999).

The College has contended that the Plaintiff has failed to allege a Title IX violation as a matter of law. (Dominican Def. Br. at 1). To support this argument, the College contended that the Amended Complaint's Title IX claim is predicated upon "two distinct scenarios for liability: (1) that the College failed to prevent the sexual assault on Ms. Wright by showing a deliberate indifference to alleged prior sexual assaults; and (2) that the College failed to implement policies and procedures related to the handling of reports of sexual assault as required by Title IX." (Dominican Def. Br. at 1–2).

■ However, the AC alleges that the College violated Title IX because it was deliberately indifferent to Ms. Wright's complaint after the attack occurred. According to the Plaintiff, the AC does not allege that the College violated Title IX because it "failed to prevent the sexual assault on Ms. Wright by showing a deliberate indifference to alleged prior sexual assaults" (as stated in the College Memorandum in Support) but rather that the College had actual notice of the student on student harassment reported by Ms. Wright, that Ms. Wright reported the incident to school officials immediately after her attack, and that the College acted with deliberate indifference after it was aware of the sexual harassment reported by Ms. Wright.

The first two elements of a Title IX violation, that the College is a recipient of federal funding and that "appropriate" persons at the College have actual knowledge of Ms. Wright's complaint are not disputed. The College has challenged the allegation of the third element, whether the AC alleges deliberate indifference. Relying upon *Oden v. Northern Marianas College,* 440 F.3d 1085 (9th Cir.2006), the College has contended that to allege successfully deliberate indifference, McGrath must allege that the College deliberately attempted to sabotage Ms. Wright's complaint or its orderly resolution. *Id.* at 1089, Dominican Def. Br. at 4.

*Oden* involved a student's complaint of sexual harassment against her music professor. *Id.* at 1087. The court—on a motion for summary judgment and not on a motion directed at the pleading—found that the facts presented did not support a finding of deliberate indifference. *Id.* at 1089. Specifically, the court found that:

The College began to act as soon as it became aware of Plaintiff's allegations. Two counselors were assigned to Plaintiff to provide psychological and practical support; they met with her more than a dozen times; they assisted her in filing a formal complaint; and they helped her drop Dalla Pozza's class immediately. After the complaint was filed, the College served it on Dalla Pozza. He was instructed not to have any contact with Plaintiff. Eventually a hearing took place, Plaintiff was believed, and Dalla Pozza was significantly disciplined.

*Id.* The plaintiff had alleged that a nine-month delay in convening a hearing violated Title IX. *Id.* The court found that there were reasons for the school's delay, including allowing time for plaintiff to retain a lawyer and allowing for delay caused by plaintiff's relocation to New Mexico. *Id.* The court held: "[w]e need not and do not decide that a delay never can constitute deliberate indifference; we decide only that this record does not permit an inference that the delay was a deliberate attempt to sabotage plaintiff's complaint or

its orderly resolution." *Id.* (emphasis in original). The *Oden* court relied on the factual record before it and did not hold that a plaintiff has to demonstrate a deliberate attempt to sabotage a harassment complaint in order to demonstrate a violation of Title IX.

The standard for deliberate indifference is whether the school failed to act reasonably under the circumstances. *See Davis,* 526 U.S. at 648, 119 S.Ct. 1661 (finding recipients are deliberately indifferent "only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances"). In *Vance v. Spencer County Public School District,* 231 F.3d 253 (6th Cir.2000), the defendant—similar to the Individual Defendants here—argued "as long as a school district does something in response to harassment, it has satisfied [its burden under the deliberate indifference] standard." *Id.* at 260. The United States Court of Appeals for the Sixth Circuit explicitly rejected this standard and held:

> If this Court were to accept [the school's] argument, a school district could satisfy its obligation where a student has been raped by merely investigating and absolutely nothing more. Such minimalist response is not within the contemplation of a reasonable response.

*Id.*

The AC has alleged that the Individual Defendants refused to take any action, by deferring to a criminal investigation. The College's failure to act in deference to the police "investigation" may prove to be actionable. *See Mills Pub. Sch. Dist.,* OCR Case No. 01–93–1123 (Dep't. of Educ. May 19, 1994) ("The District had an obligation to enact a grievance procedure which would result in prompt and equitable resolution of the sexual harassment complaints, regardless of any criminal process.");

Acad. Sch. Dist. No. 20, OCR Case No. 8–93–1023 (Dep't. of Educ. April 16, 1993) (holding where school district "decided to defer to the criminal investigation undertaken by the Sheriff's Department" that the school district was obligated to conduct an investigation and make its own determination if a violation of Title IX has occurred notwithstanding the existence of a related criminal investigation).

The Individual Defendants have not challenged the Plaintiff's allegations with respect to denial of an educational opportunity under Title IX. The AC has alleged that Ms. Wright and her mother, the Plaintiff, attempted to engage the College administrators in a dialogue during the summer to discuss accommodations that would allow Ms. Wright to feel comfortable about attending the College in the fall and that the College failed to engage them in any meaningful discussions or take steps to ameliorate the discrimination and that Ms. Wright could not safely return to school in the fall, where two of her three attackers were still enrolled. *See Murrell v. Sch. Dist. No. 1, Denver, Colo.,* 186 F.3d 1238, 1248–49 (10th Cir.1999) (holding with "little difficulty" the allegations that, due to sexual harassment, plaintiff became a danger to herself and had to leave school to be hospitalized demonstrated that plaintiff had been deprived of education benefits).

The College relies upon *Gebser v. Lago Vista Independent School District,* 524 U.S. 274, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998) for the proposition that there is no recovery in damages for a violation of administrative requirements. *Id.* at 291–92, 118 S.Ct. 1989; College Def. Memo in Support at 6. In *Gebser,* the school district had no actual knowledge of the sexual harassment of a student by a high school teacher. The plaintiff thus attempted to establish liability by the school district's

failure to "promulgate and publicize" an effective policy and grievance procedure. See *Gebser*, 524 U.S. at 291, 118 S.Ct. 1989. The court did not address failure to "follow" procedures and held that, standing alone, a "failure to promulgate a grievance procedure does not itself constitute 'discrimination.'" *Id.* at 292, 118 S.Ct. 1989. Here, the AC has alleged far more than a failure to promulgate procedures and sets forth in detail the College's actual knowledge and deliberate indifference.

The AC has adequately alleged that the College was deliberately indifferent and unreasonable in light of the known circumstances.

### The § 1983 Claim is Adequately Alleged

■ 42 U.S.C. § 1983 provides, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

To state a claim under § 1983, a plaintiff must show that (1) defendants acted under color of law so as to (2) violate a federal right of the plaintiff. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

The Amended Complaint has alleged two primary factors with respect to the action of the College under color of law. The College: (1) received federal funding (Am. Comp. ¶¶ 12, 119, 200) and (2) the College delegated its investigative responsibilities to the Orangetown Police department through a police detective who was also an employee of the College. (Am. Comp. ¶¶ 199, 201; see *id.* at ¶¶ 1, 6, 51, 70–71, 74–75, 77–79, 92, 123, 178).

■ The Individual Defendants have contended that no § 1983 liability attaches to them without factual allegations that their conduct was "coerce[d] or encourage[d]" by the State. (Memo in Support at 16). However, the AC has alleged that the Individual Defendants acted under color of law by collaborating with the local police detective who was also their employee to conceal reports of sexual assaults, including the attack on Ms. Wright and the prior April 2006 assault (Am. Comp. ¶¶ 50, 51, 79, 85, 199, 201). These allegations of collaboration with a government actor are sufficient to allege that the Individual Defendants acted under color of state law. See *Friedman v. New York City Admin. for Children's Servs.*, No. 04–CV–3077, 2005 WL 2436219, at *8–*9 (E.D.N.Y. Sept. 30, 2005) (denying a motion to dismiss a § 1983 claim against defendant Cohen where plaintiff alleged that Cohen, a private doctor, provided the Administration for Children's Services with false and malicious information that caused curtailment of plaintiff's child visitation privileges).

The AC has alleged that the Defendants were "jointly engaged with state officials in the challenged action", *Coakley v. Jaffe*, 49 F.Supp.2d 615, 624 (S.D.N.Y.1999), and thus were acting under color of law for § 1983 purposes. *Id.*; *Dennis v. Sparks*, 449 U.S. 24, 27–28, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). (See Am. Comp. ¶¶ 199, 201). In *Coakley*, the court held that plaintiff had stated a § 1983 claim against private actors based upon allegations that these defendants convinced a local assistant district attorney to conduct a "flawed investigation" that led to an al-

leged deprivation of plaintiff's federal rights. *Coakley,* 49 F.Supp.2d at 620. The court held that these allegations sufficiently set forth the element that defendants acted under color of law. *Id.* at 624.

Neither *Blum v. Yaretsky,* 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982) nor *Rendell–Baker v. Kohn,* 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982) cited by the Defendants involved collaboration between a defendant and a state official, such as has been set forth in the AC.

■ Ms. Wright had a federal right to a non-discriminatory police investigation. *See Daniels v. City of Binghamton,* No. 95–CV–688, 1998 WL 357336, at *5 (N.D.N.Y. June 29, 1998) ("Courts have recognized section 1983 equal protection claims based upon discriminatory failures by public officials to conduct proper investigations."); *Eagleston v. County of Suffolk,* 790 F.Supp. 416, 421–22 (E.D.N.Y. 1992) (upholding § 1983 claim against police based on equal protection for failure to investigate violation of protective order reported by plaintiff); *see also DeShaney v. Winnebago County Dep't. of Social Servs.,* 489 U.S. 189, 197 n. 3, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) (noting that the Equal Protection Clause is violated when a State selectively denies protective services to a certain disfavored minority).

■ Defendants violated Megan's right to equal protection when they collaborated with the Orangetown police detective to undertake an investigation of Ms. Wright's complaint of sexual assault which has been alleged to be a cover-up and sham. (Am. Comp. ¶¶ 42, 82, 86, 92, 98, 110, 139, 148, 175, 178, 213).

■ The AC has alleged personal involvement in the deprivation of this right by the Individual Defendants. In *Back v. Hastings on Hudson Union Free School District,* 365 F.3d 107 (2d Cir.2004), a case cited by the Defendants, the Second Circuit set forth several methods by which personal involvement may be established under § 1983. The *Back* Court explained, in pertinent part:

> Personal involvement [in a § 1983 deprivation] can be shown by: evidence that ... the defendant[s], after being informed of the violation through a report or appeal, failed to remedy the wrong ... or [ ] the defendant exhibited deliberate indifference ... by failing to act on information indicating that unconstitutional acts were occurring.

*Id.* at 127. The AC has alleged that: (1) each of the Individual Defendants is alleged to have failed to remedy the wrongs done to Ms. Wright, despite their knowledge of the tainted police investigation (Am. Comp. ¶¶ 1, 5, 8, 51, 53, 71–72, 74–49, 87, 91–96, 101–103, 199–201); and (2) each of the Individual Defendants is alleged to have exhibited deliberate indifference to Ms. Wright by taking part in the scheme to use a local police detective to "bury" Ms. Wright's complaint of sexual harassment. (Am. Comp. ¶¶ 51, 71, 74–79, 92, 110, 123, 178).

*Monell v. Dep't. of Social Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) cited by the Defendants, concerned the vicarious liability of municipalities for § 1983 claims under a theory of respondeat superior and concluded that, standing alone, such theory was insufficient to create liability. *Id.* at 691, 98 S.Ct. 2018. *Monell* required a showing that the conduct of the individuals reflected a "policy" adopted by the municipality in order to hold the municipality vicariously liable for acts of those individuals. *Id.* at 692, 98 S.Ct. 2018. *Back v. Hastings On Hudson Union Free School District,* 365 F.3d 107 (2d Cir.2004) cited by the Defendants, found personal involvement by defendants in an employment discrimination action

when they recommended denying plaintiff tenure and evaluated plaintiff negatively. *Id.* at 125. *Sanders v. Sears, Roebuck & Co.,* 984 F.2d 972 (8th Cir.1993) also cited by the Defendants, involved a § 1983 claim asserted against the company on the basis of an act of a security guard at one of its many stores, *see id.* at 973–74, as opposed to the allegations here that the College's administrators engaged in a pattern of conduct designed to effectively dispose of—rather than address—sexual harassment claims that were potentially embarrassing or harmful to the school. *See Turpin v. Mailet,* 619 F.2d 196, 199–201 (2d Cir.1980) (failure to take action on the part of those in senior policy making roles constituted "an official policy within the meaning of Monell") (internal quotation omitted). (Am. Comp. ¶¶ 1, 42, 71, 74–79, 82–83, 85, 92, 98, 101, 110, 123, 175, 178, 199, 201, 213). Finally, *McKinnon v. Patterson,* 568 F.2d 930 (2d Cir.1978) cited by Defendants, did not involve a motion to dismiss but, rather, involved the evaluation of evidence after entry of a judgment upon trial. *See id.* at 935.

The AC has adequately alleged a § 1983 claim.

### The Fraud Allegations Are Adequately Alleged

According to the Defendants, the AC fails to identify a specific fraudulent statement relied upon by Ms. Wright. The Defendants note that FRCP 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity" and that the Plaintiff must set forth the "who, what, when, and where" of the alleged fraud. *United States ex rel. Barmak v. Sutter Corp.,* No. 95–CV–7637, 2003 WL 21436213, at *4 (S.D.N.Y.2003). The Defendants have noted that N.Y.C.P.L.R. 3016(b) likewise requires that in all claims alleging fraud, the circumstance allegedly constituting fraud must be stated in detail.

The Plaintiff has conceded that the fraud which she has alleged related to the inducement to enroll for the 2005–2006 school year. At issue is the adequacy and particularity of the allegations in the AC made on information and belief.

The AC has alleged certain facts to support each element of its fraud claim including those alleged upon information and belief. In April 2006, the month before the attack on Ms. Wright, another female student was sexually assaulted in the College's on-campus Residence Hall, an attack that was inadequately disclosed and dealt with (Am. Comp. ¶ 49). There were other attacks reported to the Individual Defendants (Am. Comp. ¶ 188). Defendants failed to disclose any of these attacks (Am. Comp. ¶ 50, 53, 103, 188, 191–93). Information about sexual assaults on campus would have had an impact on the decision of prospective students, including Ms. Wright, to apply for admission and enroll as students at the College (Am. Comp. ¶¶ 192–93). It is alleged that the Defendants intended to misrepresent the safety of the school's campus in order to induce students to enroll there (Am. Comp. ¶¶ 191, 193), and that Ms. Wright justifiably relied on this misrepresentation of campus safety when she decided to enroll and live on campus (Am. Comp. ¶ 194) and was injured as a result (Am. Comp. ¶ 196). According to the Plaintiff, the AC has satisfied the requirements set forth in Fed. R.Civ.P. 9(b) relying upon *IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1057 (2d Cir.1993) (restating the rule that "[d]espite the generally rigid requirement that fraud be pleaded with particularity, allegations may be based on information and belief when facts are peculiarly within the opposing party's knowledge.") (internal citation omitted).

According to the Plaintiff, the Defendants have not recognized that New York law imposes on the College Defendants a duty to disclose information regarding campus crime because Defendants have superior knowledge of this essential information and that a party, such as the Individual Defendants here, has a duty to speak when he: (i) possesses superior knowledge, (ii) not readily available to the other and, (iii) knows that the other is acting on the basis of mistaken knowledge. *See, e.g., P.T. Bank Central Asia v. ABN AMRO Bank N.V.,* 301 A.D.2d 373, 377, 754 N.Y.S.2d 245, 251 (2003) (fraudulent concealment claim survived motion to dismiss because plaintiff satisfied these three elements).

■ The AC alleges that the Individual Defendants had superior knowledge of sexual assaults occurring on campus because they, exclusively, received reports of such assaults from the victims (Am. Comp. ¶¶ 190–91) and had a further distinct duty to disclose known unsafe conditions. In New York "a failure to disclose the existence of a known danger may be the equivalent of misrepresentation, where it is to be expected that another will rely upon the appearance of safety." *McKinney v. Bellevue Hosp.,* 183 A.D.2d 563, 565, 584 N.Y.S.2d 538, 540 (1st Dep't.1992) (citing Prosser, Torts § 33, at 179 (4th ed.)) (denying the defendant's motion to dismiss a fraud claim that was predicated on the defendant employer's failure to inform its plaintiff-employee of a tumor found in X-rays the defendant performed on plaintiff during a pre-employment health screening).

Under *IUE Pension Fund v. Herrmann,* cited above, the allegations of prior knowledge of prior similar assaults based on knowledge and belief arising out of the treatment of the April and May, 2006 assaults, narrowly satisfy the Rule 9(b) requirements of particularity.

### The Claim for Intentional Infliction of Emotional Distress is Adequately Alleged

■ To state a claim for intentional infliction of emotional distress, a plaintiff must plead:

(1) extreme and outrageous conduct; (2) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and injury; and (4) severe emotional distress.

*Wait v. Beck's North Am., Inc.,* 241 F.Supp.2d 172, 180–81 (N.D.N.Y.2003).

■ The Defendants have contended that this claim should be dismissed because it is duplicative and because it fails to allege either intent or outrageous conduct on behalf of the Individual Defendants. At this point of the litigation, it is uncertain whether damages to be awarded against the Individual Defendants under a theory of intentional infliction of emotional distress will overlap the damages to be awarded for the other claims asserted in the AC. Accordingly, the claim is not duplicative and should not be dismissed. *See Bender v. City of New York,* 78 F.3d 787, 793–94 (2d Cir.1996). In *Bender,* the Second Circuit upheld a jury verdict awarding damages for intentional infliction of emotional distress, false arrest and malicious prosecution. That Court recognized that the damages overlapped between those causes of action, but it allowed recovery under all three claims because of the possibility that the damages did not entirely overlap. *Id.*

■ The Defendants also argue that the AC fails to allege actual intent. (Memo in Opp. p. 8). However, the AC alleges that the Defendants' conduct with respect to Ms. Wright's complaint that she

had been raped by three different men "was sufficiently insensitive as to intentionally cause Ms. Wright to suffer severe emotion distress...." (Am. Comp. ¶¶ 177, 179). Accordingly, the AC has alleged the element of intent. *See Wait v. Beck's North Am., Inc.,* 241 F.Supp.2d 172, 180–81 (N.D.N.Y.2003) (upholding intentional infliction of emotional distress claim because plaintiff had alleged facts sufficient to apprise defendants of the nature of her claim).

The Defendants have contended that the conduct alleged in the AC was not extreme and outrageous. (Memo in Opp. at 7–8). However, the cases cited in support of that argument do not involve facts similar to those present here where it is alleged that the College refused to investigate allegations of a rape and directed the alleged victim to a police detective who was also a school employee. (Am. Comp. ¶¶ 199, 201; see *id.* at ¶¶ 1, 51, 71, 74–75, 77–79, 92, 123, 178).

 Whether the reliance upon a police investigation conducted by an officer who was an employee of the College was outrageous conduct exceeding human decency must be considered a jury issue under these circumstances. Where it is alleged that an impartial investigation was subverted and where such an investigation might have established whether or not Ms. Wright did consent or had the capacity to consent, an interrelationship between the allegedly sham investigation and Ms. Wright's suicide may constitute requisite outrageous conduct.

In light of the foregoing authorities and conclusions, the Defendants' motion to dismiss is denied.

It is so ordered.